Filed 5/9/18 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE LUIS PEREZ et al.,<br><br>    Defendants and Appellants. | E060438<br><br>(Super.Ct.No. FVI901482)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

The opinion filed in this matter on April 12, 2018 is modified as follows:

1. On page 48, delete the paragraph:

> We assume, without deciding, that counsel for Sandoval and Chavez did not forfeit their clients' present contention.

and replace it with:

> 1. *Forfeiture*.
>
> Counsel for Sandoval objected based on speculation. Counsel for Chavez expressly joined this objection. Perez's counsel did not. However, the trial court told him, "I'm going to assume you join in that objection . . . ." He could reasonably conclude that he did not have to do anything further to preserve the objection on behalf of his client.

In this appeal, defendants argue that this was tantamount to a relevance objection, because the testimony of a witness who is speculating has no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2018) § 28.56, p. 28-35.) Defendants' present argument, however, is not that the evidence was irrelevant because Iniguez was speculating about why he was attacked, but rather that the evidence was irrelevant to Iniguez's "attitude toward testifying." The speculation objection failed to preserve this argument.

Counsel for Chavez also requested "clarification" that his client did not "directly" attack Iniguez. The trial court observed, in open court, that there was no evidence to that effect. Moreover, Iniguez proceeded to testify that defendants did not physically participate in the attack. This objection, too, failed to preserve defendants' present argument.

Hence, we conclude that this argument has been forfeited.

2. *Merits*.

Separately and alternatively, we also reject this argument on the merits.

3. On page 81, delete all of section XVIII.B.1, entitled "Forfeiture."

4. On page 82, delete the subheading:

2. *Merits*.

5. On page 82, delete the paragraph:

Separately and alternatively, we also reject this contention on the merits.

and substitute the paragraph:

2

We assume, without deciding, that counsel for Sandoval and Chavez did not forfeit their clients' present contention.

Except for this modification, the opinion remains unchanged. This modification does not effect a change in the judgment.

Appellant Chavez's petition for rehearing is denied.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

Filed 4/12/18 Opinion on remand from Supreme Court (unmodified version)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE LUIS PEREZ et al.,<br><br>    Defendants and Appellants. | E060438<br><br>(Super.Ct.No. FVI901482)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Affirmed in part and reversed in part; remanded with directions.

Raymond Mark DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant Jose Luis Perez.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Edgar Ivan Chavez Navarro.

Randall Bookout, under appointment by the Court of Appeal, and H. Russell Halpern for Defendant and Appellant Pablo Sandoval.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, IV, V, VI, VII, VIII, IX, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, and XX.

Kamala D. Harris and Xavier Becerra, Attorneys General, Julie L. Garland, Senior Assistant Attorney General, and Scott C. Taylor and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

A drug dealer identified only as "Max" owed money to a group of other drug dealers for some methamphetamine that had gone missing. He decided to ambush his creditors, tie them up, rob them of any drugs and money they might have, and kill them.

Max delegated the actual commission of these planned crimes to at least nine men. Some of them, including defendant Pablo Sandoval, worked for him; others, including defendant Edgar Ivan Chavez Navarro,[1] worked for a fellow drug dealer named Eduardo Alvarado; and still others, including defendant Jose Luis Perez, worked for (or with) another drug dealer named Flor Iniguez. According to the prosecution's designated gang expert, most, if not all, of the participants — including all three of the defendants named in this case — were members or associates of the Sinaloa drug cartel; the victims were members or associates of a different cell of the same cartel.

The participants carried out the plan, but not flawlessly. One of the victims, although shot in the face and chest, survived, and he was able to provide information that led the police to defendant Perez and to Sabas Iniguez (Flor Iniguez's nephew). Perez gave statements to the police incriminating himself. Iniguez testified at trial pursuant to a plea bargain.

---

[1] In accordance with Spanish-language naming conventions, this defendant takes the surname Chavez from his father and the surname Navarro from his mother. He prefers to be called "Mr. Chavez" or "Mr. Chavez Navarro" rather than "Mr. Navarro." We will therefore refer to him as Chavez.

Defendants were convicted of multiple first degree murders, with special circumstances, as well as other crimes. They now appeal.

In the published portion of this opinion, we will hold that trial counsel forfeited any objection to expert testimony to case-specific hearsay, which is inadmissible under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), by failing to raise it below. Even though this case was tried before *Sanchez* was decided, previous cases had already indicated that an expert's testimony to hearsay was objectionable. If anything, *Sanchez* narrowed the scope of a meritorious objection by limiting it to case-specific hearsay.

In the unpublished portion of this opinion, we will hold that there was insufficient evidence to support the gang special circumstance. We also hold that the trial court erred by failing to instruct on the financial-gain special circumstance. Hence, we will reverse these two special circumstances. We will also direct the trial court to consider whether to strike the firearm enhancements under Penal Code section 12022.53, pursuant to newly enacted Senate Bill 620. Otherwise, however, we find no prejudicial error.

I

SUMMARY OF DEFENDANTS' CONTENTIONS

In this appeal,[2] defendants raise the following contentions regarding:

1. Insufficiency of the evidence:

 a. There was insufficient evidence of first degree murder on a theory of:

---

[2] Perez has also filed a related petition for writ of habeas corpus (case No. E064866). We ordered the petition considered with (but not consolidated with) this appeal for the purpose of determining whether an order to show cause should issue. We will rule on the petition by separate order.

      i.  Premeditation.

      ii.  Either robbery murder or kidnapping murder.

      iii.  Lying-in-wait murder.

    b.  There was insufficient evidence that defendants had the intent to kill, or, when applicable, that they acted with reckless indifference to human life, to support any of the special circumstances.

    c.  There was insufficient evidence that a kidnapping or a robbery was still underway when the shooting occurred to support the kidnap-murder and robbery-murder special circumstances.

    d.  There was insufficient evidence that the shooting occurred during a period of lying in wait to support the lying-in-wait special circumstance.

    e.  There was insufficient evidence to support the financial-gain special circumstance.

    f.  There was insufficient evidence that defendants had the intent to kill for purposes of the attempted murder of the victim who survived.

    g.  There was insufficient evidence of asportation of two of the victims to support the convictions of kidnapping them for robbery.

    h.  There was insufficient evidence to support the gang-related convictions and allegations.

2.  Erroneous admission of evidence:

    a.  The trial court erred by admitting evidence that witness Iniguez had been assaulted in jail.

4

b. The trial court erred by admitting the gang expert's testimony to case-specific hearsay.

3. Erroneous jury instructions:

a. The jury was erroneously allowed to find defendants guilty or premeditated first degree murder, as aiders and abettors, under the natural and probable consequences doctrine.

b. The jury was erroneously allowed to find defendants guilty of conspiracy to commit attempted murder.

c. The trial court failed to instruct on the financial-gain special circumstance.

d. The trial court failed to instruct that the multiple-murder special circumstance, as to an aider and abettor, required the intent to kill.

e. The trial court failed to instruct on the escape rule for purposes of felony murder.

f. The trial court failed to instruct on the defense of duress.

4. Prosecutorial misconduct in closing argument:

a. The prosecutor improperly argued:

i. A felony-murder theory of attempted murder.

ii. A lying-in-wait theory of attempted murder.

iii. A theory of conspiracy to commit attempted murder.

b. The prosecutor violated defendants' right to remain silent by commenting on their failure to contradict witness Iniguez's testimony.

5

5. Sentencing error: The trial court erroneously failed to state reasons for imposing the upper term for the crime of active gang participation.

## II

## FACTUAL BACKGROUND

A. *The Crime Scene*.

On June 23, 2009, around 10:30 p.m., a motorist on Highway 395 near Victorville stopped because he saw a man "stumbling in the middle of the road." The man had been shot in the forehead and in the chest. The motorist phoned 911.

When the police responded, the victim gave his name as Luis Romero. He told them that he and two other men had been kidnapped in South Gate, driven to Victorville, robbed, and shot. He identified the kidnappers as "Lalo" and "Junior."

A trail of Romero's blood led to a black Chevrolet Silverado pickup truck that was parked a few blocks away. In it, the police found the dead bodies of victims Alejandro Martin and Eduardo Gomez. They had each been shot multiple times. Empty cartridge casings showed that at least two guns had been fired — a 9-millimeter and a .40-caliber.

The hands and feet of the bodies were bound with zip ties. A set of zip ties that Romero had managed to remove was also found at the scene.

Inside the pickup, there was a black hooded sweatshirt. After defendant Sandoval was identified as a suspect, DNA from this sweatshirt was tested and found to be his.

B. *The Investigation*.

Romero told the police that victims Martin and Gomez dropped him off at a certain house on Center Street in South Gate. When he went inside, he was taken captive

6

and forced to phone the others.  The next day, they came to the house, where they, too, were taken captive.

On July 2, 2009, the police searched the house on Center Street.  It was associated with one Flor Iniguez.  The living quarters were upstairs, over a garage.  The house was vacant.  However, the police found zip ties like those found on the victims.  They also found a box of latex gloves.

That same day, based on what they learned at the house on Center Street, the police also searched a house on California Street in South Gate, also associated with Flor Iniguez.  In a van parked out front, they found approximately 70 pounds of marijuana.  While there, they encountered one Sabas Iniguez.

Inside the house, the police found a card for a storage unit in South Gate.  On July 3, 2009, they went to the storage facility.  There they encountered defendant Perez, who was driving a BMW.  A search of the BMW turned up a loaded shotgun.

Surveillance video and sales records from a Target store in South Gate showed that, on the day of the shooting, at about 12:40 p.m., three men — including defendant Perez and defendant Chavez — bought a box of latex gloves identical to the one found at the Center Street house.

Cell phone records showed that on the day of the shooting, defendant Sandoval made 24 calls from the vicinity of the Center Street house.  Additional calls made between 9:45 and 10:30 p.m. showed him going toward Victorville.  Calls made between 10:30 p.m. and midnight showed him coming back from Victorville.

7

C. *Testimony of Sabas Iniguez.*

Sabas Iniguez, nicknamed "Junior," testified at trial pursuant to a plea bargain. It called for him to plead guilty to the same crimes as defendants were charged with and to testify truthfully in this case, in exchange for a reduced sentence.

1. *The formulation of the plan.*

Iniguez distributed drugs, including methamphetamine, cocaine, and marijuana. He had several suppliers, including victim Romero. Victim Martin was victim Romero's boss, and victim Gomez was victim Martin's driver.

Flor Iniguez was Iniguez's aunt. She worked for Romero as a "mule," transporting drugs. Romero lived in Mexico; whenever he visited the United States, he would stay with Flor.

One "Max" owed victim Martin money for methamphetamine. Martin had sent "collectors" to Max's home in Mexico. Max wanted to eliminate the debt and also to get revenge on Martin and his people.

A few weeks before the shooting, Max held a meeting at a Denny's. Max brought along defendant Sandoval; this was the first time that Iniguez had ever met Sandoval. Sandoval, in turn, brought along three men Iniguez did not know. They were members of a gang called the Bell Gardens Locos. They were referred to at trial as the "unknowns." Iniguez understood that Sandoval and the unknowns worked for Max.

8

Also present at the meeting was Eduardo Alvarado, known as "Lalo." Alvarado was another one of Iniguez's suppliers. Alvarado was accompanied by defendant Chavez and one Cesar Rodriguez; they both worked for him.[3]

Max did most of the talking. The discussion included the fact that "[s]omebody" owed a debt to the victims and that "the debt needed to be handled . . . ." During the meeting, a plan was developed to "get" the victims "[s]o the debt wouldn't have to be paid." To "collect extra," they would rob the victims of money and drugs.

A few days before the shooting, Max held another meeting, at an El Pollo Loco. This time, defendant Perez was also there. Perez lived with Flor Iniguez and worked for her as her babysitter. Until then, he had not been involved in the drug business.

They discussed having all three of the victims come to the Center Street house, where the participants would grab them and tie them up. Iniguez and Perez were to act as "bait," because the victims knew them and would be comfortable around them. They were told that they "would have to go along with it, or else it was going to be [them] along with [the victims] . . . ."

2.    *The execution of the plan.*

On Sunday (i.e., two days before the shooting), Iniguez, defendant Perez, defendant Sandoval, defendant Chavez, Alvarado, Cesar Rodriguez, and the unknowns took up stations at the Center Street house.

---

[3]    Alvarado and Rodriguez were tried separately and convicted. We affirmed their convictions. (*People v. Alvarado* (Dec. 19, 2013, E054118) 2013 Cal. App. Unpub. LEXIS 9154 [nonpub. opn.].)

9

At one point, Iniguez left for a few hours. While he was away, he got a phone call saying that Romero had arrived at the house and had been tied up. When he got back, the others were making Romero phone victim Martin and victim Gomez to get them to come back to the house.

Alvarado told Iniguez and defendant Perez to go out in front of the house and wash Flor's black GMC pickup truck, so the victims would feel comfortable. Meanwhile, two other participants hid in the garage and two more waited in a parked car.

Martin and Gomez arrived, in a black Chevrolet pickup truck. They said hi and walked upstairs. The participants who had been hiding ran up the stairs behind them and pushed them into the house. There were sounds of fighting.

About 20 minutes later, someone told Iniguez and Perez to come upstairs. All of the other participants were wearing latex gloves. They had a shotgun and four handguns, including a 9-millimeter and a .40-caliber, which they "passed around"; whoever was guarding the victims would hold a gun.

The participants relieved the victims of their cell phones and took Martin's expensive watch. They blindfolded the victims, zip-tied their hands behind their backs, and duct-taped their feet together. For a while, the victims were kept in separate bedrooms. Defendant Chavez and others then brought them out to the living room and seated them on the couch. Defendant Chavez, armed with a gun, acted as a guard.

Alvarado ordered the victims to get money and drugs. Victim Martin arranged for someone to bring 20 pounds of marijuana to the house. He also arranged the pickup of

10

$100,000 in Bellflower. Several participants left to get it, taking victim Romero with them.

Alvarado told everyone that after dark, they were going to take the victims out of the house and drop them off somewhere.

Once it started to get dark, Iniguez and defendant Perez were told to drive Flor's pickup around the neighborhood and keep a lookout. They circled the neighborhood several times. On one pass, they saw victim Romero being walked down the stairs.

Four vehicles then left the Center Street house in convoy. Alvarado was driving the victims' pickup, with defendant Sandoval as his passenger. Sandoval was wearing a black hooded sweatshirt. Presumably the victims were in the back of that pickup, where their bodies were later found, but Iniguez could not see inside because the windows were tinted. Rodriguez was driving Alvarado's pickup, with defendant Chavez as his passenger. Two of the unknowns were in a gold Chevrolet Tahoe.

Iniguez and Perez, still in Flor's pickup, were told to follow the others. However, they made a wrong turn and got separated from the group. They had not yet caught up when they got a phone call saying, "it's over with" and they should go home.

At Iniguez's direction, defendant Perez phoned Flor and asked to borrow some money. Iniguez waited at a Denny's while Perez went to pick the money up. When Perez got back, he gave Iniguez $2,000. Flor later said that the $100,000 had been divided up among everybody who had been at the house.

11

D.      *Statements of Defendant Perez.*

Defendant Perez made a series of statements to the police that were admitted before his jury only.

1.      *Statements at the storage facility.*

When interviewed at the storage facility, Perez admitted knowing that the shotgun in the BMW had been used at the Center Street house, "[i]n the kidnapping that led to the homicide."

2.      *Statements at the police station on July 3.*

On July 3, 2009, the police interviewed Perez again.

Perez said that he lived at the Center Street house along with Flor, Flor's children, and Iniguez. Alvarado and Flor were in the drug business.

He admitted that he was at the Center Street house when the victims were there. He also admitted that he personally blindfolded and zip-tied victim Gomez. The other participants in the crimes included Alvarado, defendant Chavez, and defendant Sandoval.

Victim Romero was his "good friend." Romero worked for victim Martin, selling drugs. The victims were driven away in their own pickup. Flor's pickup and a third black pickup were also used in the crimes. He claimed he did not know what happened to the victims after they left the house.

3.      *Statements at the police station on July 6.*

The police interviewed Perez again on July 6, 2009.

This time, Perez explained that Max's boss owed victims Martin and Romero money for some drugs that had been lost. Romero had threatened Max's boss, so Max's boss ordered Max "to kill them."

On Saturday morning (i.e., three days before the shooting), Iniguez told Perez that they were going to "get" all three victims — "they were gonna kill 'em, . . . they were gonna take everything they had."

On Saturday night, the participants assembled at the house on Center Street. Leaving aside Iniguez and Perez, they fell into two groups. One group was led by Alvarado; it included defendant Chavez and one of the unknowns. The other group worked for Max and was led by defendant Sandoval; it included three more unknowns. They had a shotgun and other guns.

According to Perez, "[T]he reason for me to stay there was cuz . . . [Sandoval] and them[,] they wanted to kill him there." Flor, however, did not want the victims killed in her house. She said she would give Perez and Iniguez "a little money" just "for being there." Also, Perez admitted, he was hoping to get work from Sandoval.

On Sunday, victim Romero arrived. Defendant Perez went downstairs and told the others that Romero was there. They ran upstairs, tied him up, and blindfolded him. Defendant Chavez tied him up. He told them where some money was hidden.

On Monday (i.e., one day before the shooting), the participants made victim Romero call victims Martin and Gomez and get them to come to the house.

That afternoon, Iniguez and Perez were outside washing Flor's pickup and two other "guys" were hiding in the garage when victims Martin and Gomez arrived. As they

13

walked upstairs, the two guys ran up behind them, grabbed them, and pushed them inside. Perez and defendant Chavez participated in binding them.

Alvarado forced victim Martin to make phone calls in an effort to get drugs. At some point, the participants took Martin's watch and Gomez's money. Alvarado and defendant Sandoval left to consult with Max, then came back and said that they were going to kill all three of the victims.

Iniguez and Perez drove Flor's pickup around the block to keep a lookout. Meanwhile, defendant Sandoval walked the victims down to the victims' own pickup, one at a time, sat them in the back seat, and tied them up. Sandoval told Perez, "[I]f you say something . . . we're gonna do the same thing we did to them to you and your family."

One of the unknowns drove Sandoval and the victims to Victorville. Alvarado and defendant Chavez followed in Alvarado's pickup. Iniguez and Perez also followed, in Flor's pickup. However, they got lost somewhere in Victorville. Defendant Sandoval then phoned and said "they had already killed 'em." He added that the unknown who was driving shot them first, but Alvarado "went back" and "made sure and shot them again."

Iniguez waited at a Denny's while Perez picked up $5,000 from Flor for both of them.

14

E.      *Testimony of Sandraluz Garcia*.

Sandraluz Garcia  was defendant Chavez's girlfriend at the time of the crimes. Pursuant to a plea agreement, which required her to testify truthfully in this case, she had pleaded guilty to acting as an accessory after the fact, with a gang enhancement.

Chavez told her that he and Alvarado were "involved in the drug business."  They worked for the "Chapos" drug cartel in Mexico.  He also said that Alvarado had stolen some money from the cartel and was on the run from them.

She testified that, sometime shortly after June 21, 2009, Chavez said he was going dirt bike riding.  She did not hear from him for three days.  The next time she saw him, he had a lot of money.  Later, she saw Alvarado wearing an expensive watch.

After hearing that Alvarado had been arrested, Chavez told her that they had to leave.  He explained that Alvarado was in trouble and was going to try to blame him for it.  They went to Stockton and then to Utah.

F.      *Gang Evidence*.

1.      *Iniguez's testimony*.

According to Iniguez, "all the dope coming out of Mexico comes through one of the cartels . . . ."  A cartel member is supposed to work only with that cartel, though a lower-level associate might work with another cartel "on the sly."

15

Max, Martin, and one "Gordo"[4] were all cartel members. They were each on the same level of the organization; they did not work with each other. Defendant Sandoval reported to Max.

Alvarado was also a cartel member. Defendant Chavez reported to Alvarado.

At one time, Alvarado worked for Gordo. However, "right before this whole incident happened," they had a falling-out, and Alvarado started getting his drugs from Romero. Alvarado sometimes also got drugs from Max.

Iniguez himself sometimes bought drugs from Gordo and sometimes from Romero. Romero reported to Martin, who reported to Nacho, the "big boss" in Guadalajara.

2. *Testimony of the gang expert.*

Officer Jeffrey Moran testified as an expert on criminal street gangs. His qualifications are discussed further in part VIII.A, *post.*

He testified that the Sinaloa drug cartel produces large amounts of methamphetamine, cocaine, and marijuana and transports them into the United States. Its primary purpose is the distribution, transportation, and possession for sale of drugs. The head of the cartel is "El Chapo" Guzman. It has approximately 100,000 to 150,000 participants worldwide. It goes by several alternative names.

According to Officer Moran, the Sinaloa cartel operates like a franchisor, such as McDonald's. It is subdivided into territories, which in turn are subdivided into cells.

---

**4** This individual went by several nicknames, including Gordo, Wetto, and Skinny.

16

Each cell "connect[s] up to somebody in the Sinaloa cartel" but works independently of the other cells.

As evidence of a pattern of criminal gang activity, the trial court took judicial notice that Alvarado, Iniguez, and Rodriguez had been convicted of murder, attempted murder, and kidnapping, all committed on June 23, 2009 (i.e., the same crimes as in this case). In Officer Moran's opinion, all three men were either members or associates of the cartel.

As of 2009, Ignacio "Nacho" Coronel, based in Guadalajara, was the number three man in the Sinaloa cartel. Defendant Chavez once told his girlfriend that Alvarado worked for a drug cartel in Mexico called "Chapos." Also, Iniguez told the police that one "Nacho," in Guadalajara, was "the big boss" and, specifically, Martin's boss. Officer Moran concluded that Max and the victims were all members of one cell of the Sinaloa cartel and that Alvarado was a member of a separate cell of the Sinaloa cartel.

In Officer Moran's opinion, defendant Sandoval was also a member of the cartel, based on the fact that he had direct contact with Max and he was "calling the shots" on the "hit."

Defendant Chavez was either a member or an associate of the cartel, because he worked for Alvarado.

Defendant Perez was a "low level associate" of the cartel. This opinion was based on Perez's own statement that he was "pretty much at the bottom" of the cartel, which

17

Officer Moran took to be an admission that he was, in fact, in the cartel.[5] It was also based on the fact that Perez wanted to work for Sandoval and saw the crimes as a kind of "audition."

Also in Officer Moran's opinion, the crimes in this case were committed in association with the cartel.

III

PROCEDURAL BACKGROUND

Defendants were tried together, but Perez had a jury separate from Sandoval and Chavez's jury.

Each defendant was found guilty on two counts of murder (Pen. Code, § 187, subd. (a)), one count of premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664)), three counts of kidnapping for ransom (Pen. Code, § 209, subd. (a)), three counts of kidnapping for robbery (Pen. Code, § 209, subd. (b)(1)), and one count of active gang participation (Pen. Code, § 186.22, subd. (a)).

In connection with the murder counts, six special circumstances were found true: financial gain (Pen. Code, § 190.2, subd. (a)(1)), multiple murder (Pen. Code, § 190.2, subd. (a)(3)), lying in wait (Pen. Code, § 190.2, subd. (a)(15)), robbery murder (Pen. Code, § 190.2, subd. (a)(17)(A)), kidnapping murder (Pen. Code, § 190.2, subd. (a)(17)(B)), and gang-related murder (Pen. Code, § 190.2, subd. (a)(22)).

---

[5] Perez complains that the transcript of his July 6 interview does not include such an admission. However, Officer Moran specifically testified that Perez made this statement in his *July 3* interview. A transcript of the July 3 interview was not in evidence.

In connection with all counts other than active gang participation, an enhancement for the discharge of a firearm by a principal in a gang-related crime causing great bodily injury or death (Pen. Code, § 12022.53, subds. (d), (e)(1)) and a gang enhancement (Pen. Code, § 186.22, subd. (b)) were found true.

Each defendant was sentenced to a total of nine consecutive life terms — five without the possibility of parole, three with a minimum parole period of 25 years, and one with the possibility of parole — plus three years.[6]

IV

THE SUFFICIENCY OF THE EVIDENCE

THAT THE MURDERS WERE OF THE FIRST DEGREE

Perez contends that there was insufficient evidence to support the finding that the murders were in the first degree.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] Our review must presume in support of the judgment the existence of every

_____

[6] The trial court's statement of the sentence on a count-by-count basis (nine consecutive life terms) was different from its statement of the total aggregate sentence (three consecutive life terms).

The abstracts of judgment are consistent with the count-by-count sentence. Defendants' briefs set forth the count-by-count sentence as the actual sentence. Defendants have not argued that that sentence was erroneous. We therefore accept the count-by-count sentence.

19

fact the jury could reasonably have deduced from the evidence.  [Citation.] . . .  [T]he relevant inquiry on appeal is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'  [Citation.]" (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

A murder may be found to be in the first degree on several alternative grounds, including, as relevant here, if it is:  (1) "willful, deliberate, and premeditated"; (2) "committed in the perpetration of, or attempt to perpetrate . . . robbery . . . [or] kidnapping"'; or (3) "perpetrated by means of . . . lying in wait."  (Pen. Code, § 189.)

A.      *Premeditation*.

First, Perez contends that there was insufficient evidence of first-degree murder on a premeditation theory.

Perez was an aider and abettor, not an actual killer.  Under the natural and probable consequences doctrine, an aider and abettor can be guilty of second degree murder even if he or she did not personally intend to kill (or otherwise harbor malice).  (*People v. Williams* (1997) 16 Cal.4th 635, 691.)  However, an aider and abettor cannot be guilty of *first degree* murder on a premeditation theory unless he or she *personally* premeditated.  (*People v. Chiu* (2014) 59 Cal.4th 155, 158-159, 166-167.)

Perez attended the meeting at El Pollo Loco a few days before the shooting.  At that meeting, he was told that he was expected to participate in the overall scheme.  Admittedly, at that meeting, at least according to Iniguez, the only plan that was discussed was tying the victims up and robbing them; there was no evidence that there was any discussion at the El Pollo Loco of killing them.

20

Perez admitted to police, however, that, on Saturday, three days before the shooting, Iniguez told him that the plan was to kill the victims. He also admitted that he and Flor knew that the plan was to kill the victims. Nevertheless, on Saturday night, Perez took up a position, along with the others, at the house. Thereafter, he willingly participated, by buying latex gloves, binding the victims, and acting as a lookout. Finally, Perez admitted that, while the victims were being detained, Alvarado announced that they were going to kill all three of the victims. Perez nevertheless continued to act as lookout as the victims were taken away.

From the combination of his knowledge and his willing participation, it is reasonably inferable that Perez intended to kill. "It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1166.) Moreover, here, Perez had three days in which to deliberate and premeditate.

Perez argues that knowledge plus participation are insufficient to prove the necessary intent to kill. He cites *People v. Snyder* (2003) 112 Cal.App.4th 1200, which stated: "[A]n aider and abettor is chargeable as a principal only to the extent he or she actually knows and *shares* the full extent of the perpetrator's specific criminal intent, and actively promotes, encourages, or assists the perpetrator with the intent and purpose of advancing the perpetrator's successful commission of the target offense. [Citation.] It is not sufficient if the person simply gives assistance with knowledge of the perpetrator's criminal purpose." (*Id*. at p. 1220, fn. omitted.)

21

*Snyder* stands for the uncontroversial proposition that knowledge plus participation do not establish shared intent *as a matter of law*. (See also *People v. Sully* (1991) 53 Cal.3d 1195, 1227.) Nevertheless, a jury can reasonably *infer* shared intent from knowledge plus participation (at least in the absence of contrary evidence). "The act of encouraging or counseling itself implies a purpose or goal of furthering the encouraged result." (*People v. Beeman* (1984) 35 Cal.3d 547, 556.)

We recognize that Perez had no personal animus against the victims. In fact, he considered victim Romero to be a good friend. Nevertheless, he stood to gain by participating in the crimes. He worked for Flor; Flor had ordered him to remain at the house and had promised to pay him for being present. He already knew that Max wanted him to participate; in any event, violent, cartel-affiliated drug dealers were not likely to allow him to remain present without participating. Moreover, Perez admitted that he was hoping to get work from defendant Sandoval. Thus, while his own personal goals were to make some money and to please Sandoval, he intentionally furthered the commission of robbery, kidnapping, and murder in order to achieve these goals.

Perez also notes that, according to Iniguez, neither of them knew that the plan was to kill the victims and neither of them participated in binding the victims. He argues that this testimony was more credible than his own admissions, made under the stress of interrogation. However, "it is the jury, not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt. [Citation.] And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the

22

circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. [Citation.]" (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)

Iniguez had a motive to minimize his own knowledge of the full extent of the plan. Moreover, even though Perez had the same interest, he freely made damaging admissions to the police. There is a reason why statements against one's penal interest are deemed particularly credible. While false confessions do occur, the interrogation here was not particularly coercive.

Accordingly, there was sufficient evidence that Perez premeditated.

B. *Felony Murder.*

Perez also contends that there was insufficient evidence that a kidnapping or a robbery was still underway when the shooting occurred to support either (1) a felony-murder theory of first degree murder or (2) the kidnap-murder and robbery-murder special circumstances.

"The felony-murder rule provides that '[a]ll murder . . . which is *committed in the perpetration of*, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, [or] train wrecking . . . is murder of the first degree.' [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 340-341.)

Similarly, a felony-murder special circumstance requires that "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit," a specified felony. (Pen. Code, § 190.2, subd. (a)(17).)

23

A crime can be complete, for purposes of distinguishing between a completed crime and an attempt, yet still be ongoing for purposes of felony-murder. (Cf. *People v. Heath* (1998) 66 Cal.App.4th 697, 707 [when crime is in progress for purposes of aider and abettor liability].) The test for whether the underlying felony is still ongoing is called the "escape rule." "'Under this test . . . the crime continues until the criminal has reached a place of temporary safety.' [Citation.]" (*People v. Wilkins*, *supra*, 56 Cal.4th at p. 343, fns. omitted.)

"In the case of robbery, for example, the crime is committed — as distinct from a mere attempt — when the defendant removes the victim's property. [Citations.] The robbery continues, however, until the robber has escaped with his loot to a place of temporary safety. [Citations.] Once the defendant has reached a place of temporary safety, the robbery is at an end. [Citation.]" (*People v. Bigelow* (1984) 37 Cal.3d 731, 753-754.)

Here, the kidnappings were indisputably still underway when the shooting occurred. There is no need to resort to the escape rule, because the essential elements of kidnapping were still ongoing. Kidnapping is committed by "forcibly, or by any other means of instilling fear, steal[ing] or tak[ing], or hold[ing], *detain*[*ing*], or arrest[ing] any person in this state, *and carr[ying]* the person into another country, state, or county, or into another part of the same county . . . ." (Pen. Code, § 207, subd. (a), italics added; see also Pen. Code, § 209, subd. (a).) Thus, while there must be proof of asportation — "carr[ying]" — the crime is ongoing even if the carrying is over, as long as "detain[ing]" is still occurring.

24

For example, in *People v. Burney* (2009) 47 Cal.4th 203, the defendant and two accomplices pointed a gun at the victim, took his wallet, and forced him to get into the trunk of their car. After driving around for a while, they decided to kill him because he could identify them. They stopped the car, opened the trunk, and shot and killed the victim. (*Id*. at p. 212.)

The defendant argued that the kidnapping was over when the murder occurred because "movement of the victim had ceased [and] defendant had reached a place of temporary safety . . . ." (*People v. Burney*, *supra*, 47 Cal.4th at p. 233.) The Supreme Court responded, "[D]efendant's claim substantively is without merit. As we previously have recognized, 'the crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim *and* [the defendant] has reached a place of temporary safety . . . .' [Citations.] . . . 'Because [the victim] was still being detained at the time of his murder, he was killed while defendant was engaged "in the commission of" the kidnapping.' [Citations.]" (*Id*. at pp. 233-234, italics added.)

Perez seems to think that, because the crimes charged were kidnapping for robbery and kidnapping for ransom, rather than simple kidnapping, they ended once the perpetrators were no longer trying to rob or to obtain ransom. We note, if only in passing, that this logic does not apply to the kidnapping-murder special circumstance, which required only a kidnapping, regardless of motivation. More to the point, however, there was only one continuous kidnapping of each victim. It cannot be divided into a robbery-and-ransom phase and a murder phase. Even though the kidnapping was

25

originally motivated by robbery and ransom, it could and did continue even after the perpetrators had obtained all available loot.

To determine whether the robberies were still underway when the shootings occurred, it is necessary to consider the escape rule. "'In cases involving [both] a kidnapping and robbery, courts have held almost without exception that the evidence supported the conclusion the robber had not yet reached a place of temporary safety so long as the victim remained under the robber's control.' [Citations.]" (*People v. Cummins* (2005) 127 Cal.App.4th 667, 679.) "[A]s long as a robber holds the victim captive, the robber's safety is 'continuously in jeopardy' during the period of captivity if at 'any unguarded moment, the victim might . . . escape or signal for help.' [Citations.]" (*People v. Debose* (2014) 59 Cal.4th 177, 205.)

For example, in *People v. McLead* (1990) 225 Cal.App.3d 906, the defendants, who were drug dealers, invaded an apartment occupied by three competing drug dealers. (*Id*. at p. 910.) They took money and drugs from the victims. (*Id*. at p. 911.) After holding the victims captive in the apartment for a while, they tied them up, drove them some distance, pulled over to the side of the road, and shot them. (*Id*. at pp. 911-912.) Two of the victims lived, but victim Frazier died. (*Id*. at p. 912.)

On appeal, the defendants argued that the trial court erred by instructing on felony murder. (*People v. McLead*, *supra*, 225 Cal.App.3d at p. 915.) This court disagreed: "While it is true that the felony-murder rule is inapplicable to situations where the felony is completed prior to the killing, that is not the case here. [Citation.] . . . The elimination of Frazier and the takeover of his business were one continuous transaction. In addition,

26

defendants had not reached a place of temporary safety after the robbery until Frazier was killed. [Citation.] Therefore, the robbery was not completed before the murder." (*Id*. at p. 916.)

Similarly, in *People v. Powell* (1974) 40 Cal.App.3d 107, disapproved on other grounds in *People v. Harris* (1984) 36 Cal.3d 36, 53, the defendants "'got[] the drop on'" two police officers during a traffic stop (*id*. at p. 116), forced them to get into the defendants' car, and drove away with them. (*Id*. at p. 117.) The defendants took the officers' guns and flashlights; they also took cash from one officer. (*Ibid*.) The defendants drove the officers from Hollywood to a secluded area in Bakersfield. (*Id*. at pp. 116-117.) Once there, they shot and killed one officer; the other officer ran, and the defendants attempted unsuccessfully to shoot him, too. (*Id*. at p. 117.)

On appeal, the defendants argued that the trial court erred by instructing on robbery murder because any robbery had ended before the killing occurred. (*People v. Powell*, *supra*, 40 Cal.App.3d at p. 163.) The appellate court rejected this argument, stating that, as long as the defendants "were accompanied [by] and saddled with" the victims, they had not reached a place of temporary safety. (*Id*. at p. 164.)

Here, as in *McLead* and *Powell*, the perpetrators had the victims under their continuous control. They bound them with zip ties and watched over them while armed. They "could not reasonably be regarded as having reached a place of temporary safety . . . while they still had the kidnapped victim under their control in a public place. [Citation.]" (*In re Malone* (1996) 12 Cal.4th 935, 967.) "The crimes were also linked by the fact that [the perpetrators'] motive for killing may have been to prevent the victim of

27

the robbery and kidnapping from identifying him. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 101; accord, *People v. Fields* (1983) 35 Cal.3d 329, 368.)

As a fallback argument, Perez asserts that he, individually, had reached a place of temporary safety, because he had gotten separated from the main group. In *People v. Cavitt* (2004) 33 Cal.4th 187, however, the Supreme Court stated: "There is case support for the proposition that, under the escape rule, a felony continues as long as *any one of the perpetrators* retains control over the victim or is in flight from the crime scene. [Citations.]" (*Id*. at p. 209, italics added.)

Shortly thereafter, the Supreme Court applied this principle in *People v. Coffman and Marlow* (2004) 34 Cal.4th 1. There, codefendants Marlow and Coffman kidnapped victim Novis and took her to a friend's residence. (*Id*. at pp. 16-17, 23.) Marlow took the victim's purse. (*Id*. at p. 23.) While Marlow and the victim remained at the house, Coffman drove to a 7-Eleven for soda and cigarettes, then came back. (*Id*. at pp. 17, 23.) Finally, Coffman drove Marlow and the victim from the house to a vineyard, where Marlow killed the victim and buried her. (*Id*. at pp. 18, 23-24.)

Coffman argued "that when she . . . took Novis's purse and drove her car to a 7-Eleven store, while Marlow remained at the [friend's] residence with Novis, Coffman had reached a place of temporary safety definitively terminating the prior robbery as to her, even though Novis remained captive under Marlow's control." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 96.) The Supreme Court disagreed: "[T]he robbery [did not] terminate as to Coffman during her temporary absence from the house. Rather,

28

the evidence shows all of defendants' offenses against Novis to have been part of a continuous transaction for purposes of felony-murder liability." (*Id*. at p. 97.)

Here, identically, all of the participants' offenses against the victims were part of a continuous transaction, consisting of robberies, followed by kidnappings for the purpose of (among other things) killing the victims to eliminate them as witnesses.

If we were to hold that an accomplice's own temporary safety cuts off his or her liability for a later felony murder, we would be flying in the face of general principles of complicity. An accomplice does not have to be present at the scene of a felony to be liable for the intended felony. (See Pen. Code, § 31.) The aiding and abetting statute "is intended to apply criminal liability as a principal to those who are not present at the commission of an offense if, with the requisite intent, they have assisted the perpetrator. [Citation.]" (*People v. Morante* (1999) 20 Cal.4th 403, 433.) Likewise, "'[i]t is not necessary that a party to a conspiracy shall be present and personally participate with his co-conspirators in all or in any of the overt acts.' [Citation.]" (*Id*. at p. 417.)

And under the "'complicity aspect'" of the felony-murder rule (*People v. Pulido* (1997) 15 Cal.4th 713, 720), an accomplice is criminally liable for "killings occurring while the killer was acting in furtherance of a criminal purpose common to himself and the accomplice, or while the killer and accomplice were jointly engaged in the felonious enterprise." (*Id*. at p. 719.) Thus, a Moriarty-like mastermind who plans a felony and commands his underlings to carry it out is fully implicated, not only in the felony, but also in any resulting felony murder, even if he never leaves his own fireside.

29

We therefore conclude that there was sufficient evidence that the killings occurred in the perpetration of both kidnapping and robbery for purposes of both felony murder and the kidnap-murder and robbery-murder special circumstances.

C.     *Lying in Wait*.

Defendants contend that there was insufficient evidence that the shooting occurred during a period of lying in wait to support of either (1) the lying-in-wait theory of first degree murder or (2) the lying-in-wait special circumstance.

Lying-in-wait murder and the lying-in-wait special circumstance have three elements in common:  (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.  (*People v. Nelson* (2016) 1 Cal.5th 513, 549 [special circumstance]; *People v. Russell* (2010) 50 Cal.4th 1228, 1244 [first degree murder].)[7]

"A lying-in-wait special circumstance can apply to a defendant who, intending that the victim would be killed, aids and abets an intentional murder committed by means of lying in wait.  [Citations.]  In this factual setting, the questions are whether the defendant, with the intent to kill, aided and abetted the victim's killing, and whether the actual killer intentionally killed the victim by means of lying in wait.  [Citation.]" (*People v. Johnson* (2016) 62 Cal.4th 600, 630.)

---

**7**     The intent elements, however, differ:  "' . . . [T]he lying-in-wait special circumstance requires intent to kill, while lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death.  [Citation.]'  [Citation.]" (*People v. Nelson*, *supra*, 1 Cal.5th at p. 549.)

"[F]irst degree murder by means of lying in wait does not contain a temporal requirement. [Citation.]" (*Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 908 [applying California law].) It merely requires a killing "by means of" lying in wait. (Pen. Code, § 189.) Prior to 2000, the lying in wait special circumstance did have a temporal requirement; it required a killing "while" lying in wait. In March 2000, however, the voters enacted Proposition 18, which amended the definition of the special circumstance, so now, it, too, merely requires a killing "by means of" lying in wait. (Pen. Code, § 190.2, subd. (a)(15); see generally *People v. Johnson*, *supra*, 62 Cal.4th at p. 634.)

"[T]he voters' purpose in amending the lying-in-wait special circumstance was to eliminate the temporal distinction between the special circumstance and lying-in-wait first degree murder, and thereby expand the class of cases in which the special circumstance could be found true . . . ." (*People v. Johnson*, *supra*, 62 Cal.4th at p. 636.)

"The voter information guide shows that voters were informed that the courts had interpreted the special circumstance's reference to a killing 'while' lying in wait to require that the murder have 'occurred immediately upon a confrontation between the murderer and the victim.' [Citation.] According to the Legislative Analyst, this interpretation precluded application of the special circumstance if the defendant watched and waited for the victim, but the killing occurred after the defendant had captured the victim and transported him or her to another location. [Citation.] The Legislative Analyst explained that the passage of Proposition 18 would replace the special circumstance's previous language with reference to a killing 'by means of' lying in wait,

31

thereby permitting application of the special circumstance in that previously prohibited scenario. [Citations.]" (*People v. Johnson*, *supra*, 62 Cal.4th at p. 635.)

In sum, then, now a *surprise attack* must come immediately after the watching and waiting; however, there is no requirement that the *killing* must come immediately after the watching and waiting. All that is required is that the killing must be committed *by means of* the watching and waiting.

Here, the participants started watching and waiting at the Center Street house on Saturday night. On Sunday, they launched a surprise attack on victim Romero, and on Monday, on victims Martin and Gomez. Apparently, the victims were held at the Center Street house overnight, from Monday until Tuesday, to give them an opportunity to round up money and drugs for their captors. However, there was substantial evidence that the plan all along was to kill them after robbing them. And sure enough, on Tuesday night, they were driven to Victorville and shot. The period of watching and waiting that enabled the participants to get the drop on the victims, to capture them, and to bind them, also ultimately enabled the participants to kill them. Thus, the murders were committed by means of the watching and waiting.

V

## THE SUFFICIENCY OF THE EVIDENCE OF INTENT TO KILL

Chavez and Perez[8] contend that there was insufficient evidence that they had the intent to kill, or, when applicable, that they acted with reckless indifference to human life, to support the special circumstances.

As applied to a defendant who is not the actual killer, four of the special circumstances — financial gain (Pen. Code, § 190.2, subd. (a)(1)), multiple murder (Pen. Code, § 190.2, subd. (a)(3)), lying in wait (Pen. Code, § 190.2, subd. (a)(15)), and gang-related murder (Pen. Code, § 190.2, subd. (a)(22)) — required that the defendant had the intent to kill.  (Pen. Code, § 190.2, subd. (c).)

The remaining two special circumstances — robbery murder (Pen. Code, § 190.2, subd. (a)(17)(A)) and kidnapping murder (Pen. Code, § 190.2, subd. (a)(17)(B)) — required that the defendant *either* had the intent to kill *or* was a major participant who acted with reckless indifference to human life.  (Pen. Code, § 190.2, subds. (c) & (d).)

---

**8**     We do not understand Sandoval to be raising this argument.  He purports to join in all of Chavez's arguments, "to the extent [Chavez]'s arguments both pertain to and potentially benefit him."  However, neither defendant discusses the evidence pertaining specifically to Sandoval.  While one appellant is allowed to join in another appellant's argument (Cal. Rules of Court, rule 8.200(a)(5)), "each appellant has the burden of demonstrating error and prejudice [citations]."  (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

In any event, there was substantial evidence that Sandoval had the intent to kill. All of the reasons for finding intent to kill as to Chavez and Perez also apply to Sandoval. In addition, according to Iniguez, Alvarado and Sandoval left in the same pickup as the victims; a sweatshirt with Sandoval's DNA was found in that pickup.  It is reasonably inferable that Alvarado and Sandoval were the shooters, and it seems indisputable that the shooters had the intent to kill.

33

As we discussed in part IV.A, *ante*, there was substantial evidence that Perez premeditated and, a fortiori, that he had the intent to kill.

There was also substantial evidence that Chavez had the intent to kill. Chavez attended the meeting at Denny's a few weeks before the shooting. Thus, he knew that Max owed a debt to Martin and Romero. He also knew that the plan was to "get" the victims "[s]o the debt wouldn't have to be paid." While the word "get," standing alone, might be ambiguous, in this context, it clearly meant "kill." Chavez willingly aided and abetted the crimes by buying latex gloves and by guarding the victims. He also rode along in one of the pickups to Victorville. As with Perez (see part IV.A, *ante*), from the combination of his knowledge and his willing participation, it is reasonably inferable that Chavez had the intent to kill.

Chavez argues that there was no evidence that he knew who took guns to Victorville (or even if anyone did). However, while the participants were in the Center Street house, they had a shotgun and four handguns between them. They kept passing them around, so that whoever was guarding the victims had a gun. Chavez himself held a gun while guarding the victims. Obviously, the participants who rode in the lead pickup with the victims would hardly leave their guns behind at the house. They would hold on to them — at a minimum to keep control of the victims, but also to kill them, as Chavez knew they intended to do.

Finally, both Chavez and Perez also argue that there was insufficient evidence that they intended to aid and abet the attempted murder of Romero. As discussed further in part XVI, *post*, to be guilty of *attempted* murder, either as a direct perpetrator or as an

34

aider and abettor, they had to have the intent to kill.  (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.)  As just discussed, however, there was substantial evidence that both Chavez and Perez did have the intent to kill for purposes of the murder counts.  The same evidence was also sufficient to show that they had the intent to kill for purposes of the attempted murder count.

## VI

### THE SUFFICIENCY OF THE EVIDENCE

### TO SUPPORT THE FINANCIAL-GAIN SPECIAL CIRCUMSTANCE

Defendants contend that there was insufficient evidence to support the financial-gain special circumstance.

When a defendant is charged with both a financial-gain special circumstance and a robbery-murder special circumstance, "' . . . the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant.' [Citation.]" (*People v. Ervine* (2009) 47 Cal.4th 745, 790.)  Some examples include "the killing of a victim in a murder for hire [citation] or in an attempt to secure the proceeds of a life insurance policy covering the victim [citation] or *to avoid a debt owing to the victim* [citation]." (*People v. Mickey* (1991) 54 Cal.3d 612, 678, italics added.)

Here, Iniguez testified that Max had dual reasons for ordering the killing.  First, Max owed money to Martin and Romero for methamphetamine, and killing them would eliminate that debt.  Specifically, Iniguez testified that "they wanted to get them.  So the debt wouldn't have to be paid."  "By taking care of [Martin] and [Romero], they

35

wouldn't have to pay the debt that was owed." Second, they would "collect extra" by robbing the victims of money and drugs. Because killing the victims was an essential prerequisite of avoiding the debt, which was a financial gain separate and distinct from the robbery, there was sufficient evidence to support the financial gain special circumstance.

Defendants rely on an admission that Iniguez made on cross-examination:

"Q . . . If Martin, the chauffeur Gomez, and Romero are all killed, then Max's debt is erased.

"A It will — it won't be 'cause there's still somebody that will be higher than Martin that will try to settle matters with Max.

"Q Sooner or later.

"A Sooner or later."

Iniguez also admitted that Max "probably" had "qualms" about the "risk" that the killings "could possibly lead to cartel wars . . . ."

Iniguez's admission on cross could be viewed as contradicting his testimony on direct. Alternatively, however, they could be reconciled as meaning that Max could avoid repaying the debt in the short term and also hoped he could avoid repaying the debt in the long term, although, in Iniguez's opinion, this hope was unduly optimistic. It seems the jury took the latter view; if so, there was sufficient evidence to support it.

Finally, defendants argue that, even assuming Max acted for financial gain, there was no evidence that they, personally, stood to gain financially. However, a person who aids and abets a "murder . . . carried out for financial gain" (Pen. Code, § 190.2, subd.

36

(a)(1)) can be subject to the financial-gain special circumstance even if he or she has no personal financial motive. (*People v. Battle* (2011) 198 Cal.App.4th 50, 84; *People v. Singer* (1990) 226 Cal.App.3d 23, 43; *People v. Freeman* (1987) 193 Cal.App.3d 337, 339-340.)

VII

THE SUFFICIENCY OF THE EVIDENCE

OF ASPORTATION FOR PURPOSES OF KIDNAPPING FOR ROBBERY

Defendants contend that there was insufficient evidence of "asportation in connection with a robbery" to support the convictions of kidnapping of Martin and Gomez for robbery.

"Kidnapping for robbery requires asportation, i.e., movement of the victim that is not merely incidental to the commission of the robbery and that increases the risk of harm over that necessarily present in the crime of robbery itself. [Citations.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 487.)

Basically, defendants argue that the only movement of Martin and Gomez that satisfied this requirement consisted of the drive from South Gate to Victorville, which occurred after the robbery was already over.[9] They rely on *People v. Isitt* (1976) 55 Cal.App.3d 23, which stated: "An element of the crime of kidnap for robbery is the specific intent to rob. [Citations.] That crime, however, is not committed unless the

---

**9** Defendants do not challenge their conviction of kidnapping for robbery with respect to Romero, because there is evidence that some of the participants took Romero with them when they went to Bellflower to get $100,000.

intent is formed before the kidnap commences [citation] and the asportation is undertaken with that intent and purpose in mind [citation]." (*Id*. at p. 28.)

In *People v. Laursen* (1972) 8 Cal.3d 192, the Supreme Court rejected an essentially identical contention. There, the defendant and an accomplice committed the armed robbery of a grocery store. When they jumped into their getaway car, however, it refused to start. They therefore accosted a bystander in the parking lot and forced him, at gunpoint, to drive them away in his car. (*Id*. at p. 196.) On appeal, the defendant argued "that the asportation of [the victim] was unrelated to the robbery since it occurred after that crime had been completed." (*Id*. at p. 198, fn. omitted.)

The Supreme Court acknowledged "the rule that a kidnaping in which a robbery occurs does not constitute kidnaping for the purpose of robbery unless the specific intention to rob is present at the time of the original asportation. [Citation.] (*People v. Laursen*, *supra*, 8 Cal.3d at p. 198.) It continued: "Contrary to defendant's contentions, we have never held that [Penal Code] section 209 requires that the separately defined crimes of robbery and kidnaping be tied together by a coexistence of the elements of intent at the commencement of the criminal transaction; or, to state it in a different fashion, that kidnaping, as well as robbery, must be simultaneously premeditated as a part of a single course of criminal conduct." (*Id*. at p. 199.)

Rather, "where a kidnaping is in furtherance of a robbery during which the kidnaping occurs, a violation of [Penal Code] section 209 is committed even though the intent to kidnap was formulated after the robbery commenced." (*People v. Laursen*, *supra*, 8 Cal.3d at p. 199.) In the case before it, the robbery was still underway when the

38

kidnapping occurred, because the robbers had not yet reached a place of temporary safety. (*Id*. at pp. 199-200.) Indeed, the asportation "was for the purpose of effecting defendant's escape from the scene where the robbery was perpetrated." (*Id*. at p. 200.)

Here, similarly, the robbery was still underway when the victims were driven to Victorville. As already discussed in part IV.B, *ante*, "'[i]n cases involving [both] a kidnapping and robbery, courts have held almost without exception that the evidence supported the conclusion the robber had not yet reached a place of temporary safety so long as the victim remained under the robber's control.' [Citations.]" (*People v. Cummins*, *supra*, 127 Cal.App.4th at p. 679.) Even though the participants had finished taking money and other property from the victims, the victims were still under their control until the victims were shot.

Thus, we may assume, without deciding, that the movement of the victims in and around the house on Center Street failed to satisfy the asportation requirement for kidnapping for robbery. Even if so, the movement of the victims during the drive to Victorville did meet the definition. Moreover, it was carried out for purposes of a robbery that was still underway.

VIII

THE SUFFICIENCY OF THE EVIDENCE

TO SUPPORT THE GANG-RELATED CONVICTIONS AND ALLEGATIONS

Defendants contend that there was insufficient evidence to support the gang-related convictions and allegations, in part because the prosecution gang expert was not qualified and his testimony lacked foundation.

A.      *Additional Factual and Procedural Background.*

Officer Moran had been a member of the Gang Division since 2007.  As such, he had taken two 24-hour classes on gangs.  In 2008 and again in 2010, he had taken additional 32-hour classes on gangs, which had included information on cartels.

From 2007 through 2011, Officer Moran was assigned to a gang task force; during this time, he talked to gang members "pretty much on a daily basis."  He had investigated narcotics trafficking cases.  He had worked on "a few cases" in which drug cartels were involved, although he was not the designated gang expert.

Because he had never previously testified as an expert on drug cartels, he felt the need to "do some homework" in this case.  Thus, he had spoken to several members of the Drug Enforcement Agency (DEA) and he had taken classes from the California Gang Investigators Association (CGIA).  He had carried out additional research on his own using sources available to the public, such as federal State Department and Justice Department websites, articles from Forbes and Newsweek, and Internet translations of articles from Mexican magazines.

B.      *Forfeiture*.

Preliminarily, the People respond that defendants forfeited their present contention by failing to raise it below.

Both sides claim that *People v. Dowl* (2013) 57 Cal.4th 1079 supports their position on forfeiture.  There, a police officer testified, as an expert, that the defendant was in possession of marijuana for the purpose of sale.  (*Id*. at pp. 1082-1083.)  The defendant testified that he was in possession for the lawful purpose of personal medical

40

use.  (*Id*. at p. 1083.)  On appeal, the defendant argued that the officer's testimony was not substantial evidence sufficient to support a conviction, because he lacked "experience in differentiating those who possess marijuana lawfully for medical purposes from those who possess it unlawfully with the intent to sell." (*Id*. at p. 1083.)

The Supreme Court held that the defendant had forfeited any contention that the expert's testimony was inadmissible by failing to object on this ground at trial.  (*People v. Dowl*, *supra*, 57 Cal.4th at pp. 1087-1088.)  "Because a party offering expert testimony need not establish the witness's qualifications absent an objection [citations], defendant's failure to object at trial eliminated the incentive of the prosecution 'to provide additional testimony to lay a foundation for [the officer'] testimony' [citation] and of the trial court to 'take steps to prevent error from infecting the remainder of the trial' and to develop an adequate record.  [Citation.]  He therefore cannot now challenge on appeal the testimony's admissibility based on the officer's qualifications." (*Id*. at p. 1088, fn. omitted.)

It further held:  "It follows from this conclusion, and from other basic principles of California law, that defendant also may not now obtain reversal by having a reviewing court declare on appeal, as a matter of substantial evidence review, that [the officer] was unqualified to render an opinion at trial regarding defendant's intent to sell." (*People v. Dowl*, *supra*, 57 Cal.4th at p. 1089; see also *id*. at p. 1089, fn. 3.)

It did also hold that:  "[D]espite his failure to object, defendant may argue on appeal that the evidence put before the jury at trial — including the officer's opinion testimony — was insufficient to establish he possessed the marijuana for purposes of

sale.  [Citation.]"  (*People v. Dowl*, *supra*, 57 Cal.4th at p. 1089.)  However, it rejected this argument, noting that the officer's opinion was based on specific facts that were supported by the record.  (*Id.* at pp. 1091-1092.)

It is true that, under *Dowl*, defendants have forfeited any evidentiary objection to Officer Moran's opinions.  However, they can still argue that his opinions did not constitute substantial evidence.  In this context, they cannot argue that he was not qualified, but they can argue that his opinions lacked necessary support.  Even aside from *Dowl*, it is well-established that "' . . . when an expert bases his or her conclusion on factors that are "speculative, remote or conjectural," or on "assumptions . . . not supported by the record," the expert's opinion "cannot rise to the dignity of substantial evidence" and a judgment based solely on that opinion "must be reversed for lack of substantial evidence."'  [Citation.]"  (*People v. Wright* (2016) 4 Cal.App.5th 537, 545.)

Here, Officer Moran specified that his testimony about the Sinaloa cartel was based on the "homework" he had done, which included talking to DEA agents, taking CGIA classes, researching federal websites, and reading magazine articles.  He specifically testified that these were all sources of information on which an expert would commonly rely.  Thus, his testimony was not speculative or conjectural.

Defendants argue that some of this material was publicly available and hence not a proper subject for expert testimony.  An expert's testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ."  (Evid. Code, § 801, subd. (a).)  However, an expert is not forbidden to rely on publicly available information.  Here, the operations of the Sinaloa

42

cartel were sufficiently beyond common experience to be a permissible subject of expert testimony.  This is true even assuming that a nonexpert who was sufficiently motivated could manage to bone up on the subject.  (See *People v. Rodriguez* (2014) 58 Cal.4th 587, 639 ["Expert testimony regarding what does and does not cause rubber to fracture is sufficiently beyond common experience to be admissible even if parts of that testimony refer to matters within common knowledge."].)

Finally, defendants argue that there was insufficient evidence of an organizational or associational connection between them and the Sinaloa cartel.  Under *People v. Prunty* (2015) 62 Cal.4th 59, Penal Code section 186.22 "requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang. . . .  [W]hen the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets."  (*Id*. at pp. 67-68.)

Here, one connection to the Sinaloa cartel ran through Alvarado.  Defendant Chavez told his girlfriend that both he and Alvarado worked for the "Chapos" drug cartel in Mexico.  Officer Moran identified "El Chapo" Guzman as the head of the Sinaloa cartel.  Defendant Chavez worked for Alvarado; so did Rodriguez.

Another connection ran through victim Martin.  Martin reported to Nacho, the "big boss" in Guadalajara.  Officer Moran identified Nacho as Ignacio Coronel, a high-ranking member of the Sinaloa cartel, who was based in Guadalajara.  Thus, as he concluded,

victim Romero and victim Gomez, who both worked for Martin, also worked for the Sinaloa cartel.

Iniguez identified three men as cartel members who were all at the same level — Gordo, Max, and Martin. Admittedly, Iniguez did not testify that they were members of the *same* cartel. He even acknowledged that there was more than one Mexican drug cartel. However, he testified that he himself sometimes bought drugs from Gordo and sometimes from Martin. Alvarado likewise used to buy drugs from Gordo but then started buying them from Martin; Alvarado also sometimes obtained drugs from Max. According to Iniguez, a cartel member is supposed to work only with that cartel. It was reasonably inferable that Gordo, Max, and Martin were at the top of different cells of the same cartel — namely, the Sinaloa cartel. In fact, Officer Moran drew exactly this inference.

In addition, as the People point out, the crimes in this case arose out of a debt that Max owed Martin for some methamphetamine that had gone missing. This was some evidence that Max and Martin engaged in drug transactions with each other, which in turn was evidence that they were in the same cartel.

Finally, defendant Sandoval reported to Max, and defendant Perez admitted that he participated in the crimes in the hope of getting work from Sandoval. Thus, both of them were affiliated with the Sinaloa cartel.

Defendants place great weight on Iniguez's use of the word "freelance" to describe both himself and Alvarado. In context, however, he was clearly referring to the fact that

they bought drugs from both Gordo and Martin.  In other words, they were not bound to any one *cell* of the cartel.**10**

Defendants also rely on Iniguez's testimony that Gordo was "from a different cartel."  However, this came in response to a question about where Gordo stood in a particular exhibit that had been created to illustrate the various cells of the Sinaloa cartel.  Thus, it appears that Iniguez was using "cartel" to mean "cell."  Elsewhere in his testimony, Iniguez similarly used "cartel, or whatever you want to call it" to refer to what, in context, was clearly just a single cell of a cartel.

The gang enhancement required evidence that the crimes were "committed for the benefit of, at the direction of, *or* in association with" the Sinaloa cartel.  (Pen. Code, § 186.22, subd. (b)(1), italics added.)  The fact that defendants (Sandoval, Chavez, and Perez) as well as their accomplices (Alvarado, Iniguez, and Rodriguez)**11** were all affiliated with the Sinaloa cartel was sufficient evidence of this.  "A trier of fact can rationally infer a crime was committed 'in association' with a criminal street gang . . . if the defendant committed the offense in concert with gang members.  [Citation.]" (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1021.)

Unlike the gang enhancement, however, the gang special circumstance cannot be satisfied by evidence that the crime was committed in association with a gang.  It

---

**10**    Defendants also quote Iniguez as testifying that he worked for "'[p]retty much everybody.'"  (Italics omitted.)  The portions of the reporter's transcript that defendants cite, however, do not contain this quote.

**11**    Alvarado, Iniguez, and Rodriguez also committed the offenses that were used to show a pattern of criminal gang activity by members of the Sinaloa cartel.

*[footnote continued on next page]*

specifically requires evidence that "the murder was carried out to further the activities of" the relevant gang. (Pen. Code, § 190.2, subd. (a)(22).)[12] Here, the crimes may have furthered the activities of the participants' own cell; however, they could not further the activities of the cartel as a whole, because the victims were part of another cell of the same cartel. Indeed, Iniguez conceded that, in killing Martin and Romero, Max risked retaliation from the cartel. Moreover, the killings would not necessarily "erase[]" Max's debt to Martin, "[be]cause there's still somebody higher than Martin that will try to settle matters with Max." Similarly, Chavez told his girlfriend after the killings that Alvarado was on the run from the cartel. In sum, then, the crimes actually cut against the interests of the overall cartel.

There was insufficient evidence that the participants' cell was, in itself, a criminal street gang. The statutory definition of a criminal street gang requires, among other things, that the alleged gang must have "a common name or common identifying sign or symbol . . . ." (Pen. Code, § 186.22, subd. (f).) There was no evidence that the participants' cell had any such common name, sign, or symbol.

We therefore conclude that there was sufficient evidence to support the convictions for active gang participation (Pen. Code, § 186.22, subd. (a)) and to support the gang enhancements (Pen. Code, § 186.22, subd. (b).) However, there was insufficient evidence to support the gang special circumstances. (Pen. Code, § 190.2, subd. (a)(22).)

---

[12] The People's discussion of the sufficiency of the evidence to support the gang special circumstance rather conspicuously fails to mention this element.

46

## IX

## THE ADMISSION OF EVIDENCE

## THAT INIGUEZ HAD BEEN ASSAULTED IN JAIL

Defendants contend that the trial court erred by admitting evidence that Iniguez had been assaulted in jail.

A.     *Additional Factual and Procedural Background*.

Iniguez testified that he was in protective custody.  He then testified:

"Q  What has happened to you since you're been in custody?

"A  I got attacked when I was in general population due to the statements I made."

Sandoval's counsel objected, "This line of questioning is speculation."  The trial court overruled the objection.  It then stated:

"[THE COURT:]  And [Chavez's counsel], [Perez's counsel], I'm going to assume you join in that objection, and the same ruling for your client?

"[CHAVEZ'S COUNSEL]:  . . . My only concern is clarification that the fact that he may have been attacked doesn't mean my client did any attacking directly.

"THE COURT:  Right.  I don't think there is any evidence of that.  If there is, that is certainly something that can be brought out if there's a foundational basis for it."

Iniguez then testified that he had been attacked by from seven to nine fellow inmates.  "I got cut up with razor blades . . . .  Beat up in a corner."  During the attack, these other inmates called him a snitch.  He explained that other inmates "check [an inmate's] paperwork," including police reports, to make sure the inmate is not a snitch.

47

Iniguez confirmed that defendants did not physically participate in the attack. When it occurred, he was housed with Rodriguez, but not with defendants. At one point, he had been housed with Sandoval, but Sandoval had been moved before the attack.

B.    *Discussion*.

We assume, without deciding, that counsel for Sandoval and Chavez did not forfeit their clients' present contention.

"'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court. [Citations.]' [Citations.] '[T]here is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is "directly linked" to the defendant.' [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 668.)

Defendants acknowledge these principles; however, they argue that the evidence was irrelevant in this case because the assault occurred before Iniguez was convicted, but he decided to testify only after he was convicted, and then only in consideration of a significant sentence reduction.

But this is a non sequitur. Attempts to intimidate a witness are relevant because they show that the witness is testifying despite such attempts, and thus is more likely to be telling the truth. This is true even if the witness is testifying pursuant to a plea bargain. It is also true even if, prior to the plea bargain, the witness was reluctant to testify. A witness who, like Iniguez, has been attacked by seven to nine desperate

48

characters, beaten, and slashed with razor blades may well be reluctant to testify, even with a plea bargain. And this is particularly true in light of the specifics of Iniguez's plea bargain. A reduction from life without the possibility of parole to life with the possibility of parole after 50 years is arguably not a very compelling incentive (see Pen. Code, § 2933.2, subd. (a) [persons convicted of murder are not entitled to postsentence conduct credit]),[13] especially when you will have to spend your time in prison with people who are looking to beat you up. Thus, even after his plea bargain, the fact that he had been attacked for snitching remained relevant.

Defendants' counsel were free to make the same argument to the jury as defendants argue in this appeal — that Iniguez's real motivation was to obtain the plea bargain, not to tell the truth. However, he could have had both motivations. In any event, the jury was entitled to hear the evidence on both sides so it could make up its own mind.

In their reply briefs, defendants argue that the evidence was more prejudicial than probative because it would have led the jury to suspect that they were behind the attack. They forfeited this argument by failing to object on this ground at trial. They forfeited it again by failing to raise it in their opening briefs. (*People v. Clark* (2016) 63 Cal.4th 522, 552.) Even absent forfeiture, we would reject it. Once again, Iniguez testified that defendants did not physically participate in the attack. He also testified that they were not housed with him at the time. Rodriguez, who *was* housed with him, would seem to

---

**13** Sandoval himself characterizes the incentive as a mere "glimmer of hope that [Iniguez] might someday be released from prison."

49

be a more likely suspect.  Moreover, Iniguez testified that inmates in general are hostile to snitches in general — so much so that they inspect other inmates' "paperwork."  Thus, the evidence was not unduly likely to make the jury think defendants were behind the attack.

1.    *The trial court's admonition to Iniguez.*

Shortly after Iniguez took the stand, the trial court interrupted to admonish him, in the presence of the jury, that he had a right to consult with his attorney during questioning, and also that he was subject to possible adverse effects "if the deal doesn't go through . . . ."

Defendants do not contend that this was, in itself, reversible error.  Thus, they have forfeited any such contention.  They also forfeited it by failing to object to the admonition below.  (See, e.g., *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038.)  However, they do argue that the prejudicial effect of the evidence that Iniguez had been assaulted was compounded by the trial court's admonition, because it "had the unfortunate effect of vouching for [Iniguez]'s credibility."  (Fn. omitted.)

Because we hold that the admission of the challenged evidence was not error and, if error, was forfeited, we have no occasion to consider whether it was prejudicial.  A fortiori, we have no occasion to consider whether it was *cumulatively* prejudicial in combination with the trial court's admonition.  Finally, even if we were to hold that the admission of the challenged evidence *was* error, we would not consider cumulative prejudice from the admonition, because defendants have failed to preserve any claim that the admonition itself was erroneous.

50

THE GANG EXPERT'S TESTIMONY TO CASE-SPECIFIC HEARSAY

Chavez contends that much of the gang expert's testimony consisted of case-specific hearsay, which is inadmissible under *Sanchez*.

The People respond, among other things, that Chavez's trial counsel forfeited this contention by failing to object to the gang expert's testimony below. Ordinarily, "the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted. [Citations.]" (*People v. Stevens* (2015) 62 Cal.4th 325, 333; see also Evid. Code, § 353, subd. (a).) Chavez argues, however, that his argument is not subject to forfeiture because it is based on *Sanchez*, and *Sanchez* was not decided until after his trial.[14]

"""[W]e have excused a failure to object where to require defense counsel to raise an objection 'would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal.'""" [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 704-705.)

"In determining whether the significance of a change in the law excuses counsel's failure to object at trial, we consider the 'state of the law as it would have appeared to competent and knowledgeable counsel at the time of the trial.' [Citation.]" (*People v.*

---

[14] Defendants' trial ran from October 17-November 1, 2013.

*Black* (2007) 41 Cal.4th 799, 811.) We therefore need to review the applicable law prior to and leading up to *Sanchez,* even if only to decide the People's forfeiture claim.

A. *Crawford*.

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Under state law, hearsay is generally inadmissible unless it is within some statutory exception to the hearsay rule. (Evid. Code, § 1200, subd. (b).)

In California and elsewhere, including in the federal courts, "'[a]n expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. . . .' [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 137; see also Fed. Rule Evid. 703.) The thinking is that the out-of-court statements are admitted to shed light on the expert's reasoning, and not for their truth. (See, e.g., CALCRIM No. 360.)

*Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] held that if a hearsay statement is "testimonial," the confrontation clause prohibits its admission against a criminal defendant, unless (1) the declarant is unavailable at trial, and (2) the defendant has had a prior opportunity to cross-examine the declarant. (*Id.* at pp. 53-54, 55-56, 68.) However, the confrontation clause "does not bar the use of

52

testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Id*. at p. 59, fn. 9.)

One of the many questions that arose in the wake of *Crawford* was whether the confrontation clause limits the admission of an expert's testimony to hearsay that forms a basis for his or her opinions.

B.      *Williams*.

In 2012, the United States Supreme Court took up this question in *Williams v. Illinois* (2012) 567 U.S. 50 [132 S.Ct. 2221, 183 L.Ed.2d 89], as presented by the following facts.

A state police lab sent vaginal swabs from a rape victim to Cellmark Diagnostics Laboratory (Cellmark); Cellmark sent back a DNA profile. (*Williams v. Illinois*, *supra,* 567 U.S. at p. 59.) Earlier (as a technician ultimately testified), she had personally developed a DNA profile from the defendant's blood and entered it into a state database. (*Id*. at pp. 59, 123.)

At the defendant's trial, Sandra Lambatos, another technician employed at the state police lab, testified:

"'Q  Was there a computer match generated of the male DNA profile found in semen from the vaginal swabs of [the victim] to a male DNA profile that had been identified as having originated from [the defendant]?

"'A  Yes, there was.

"'Q  Did you compare the semen . . . from the vaginal swabs of [the victim] to the male DNA profile . . . from the blood of [the defendant]?

53

"'A Yes, I did . . . .

"'Q [I]s the semen identified in the vaginal swabs of [the victim] consistent with having originated from [the defendant]?

"'A Yes.' [Citation.]" (*Williams v. Illinois*, *supra*, 567 U.S. at p. 124 [dis. opn. of Kagan, J.]; see also *id*. at p. 61 [lead opn. of Alito, J.]; *id*. at p. 87 [conc. opn. of Breyer, J.])

On cross-examination, Lambatos admitted that she relied on the Cellmark DNA profile, and she had no personal knowledge of how Cellmark had developed that DNA profile. (*Williams v. Illinois*, *supra*, 567 U.S. at p. 61-62 [lead opn. of Alito, J.].)

The issue before the Supreme Court was whether Lambatos's testimony that the Cellmark DNA profile came from the swabs violated the confrontation clause as construed in *Crawford*. This issue produced no majority opinion, and not even a true plurality opinion; rather, there was a 4-1-4 split.

Justice Alito authored the lead opinion, joined by three other justices. He accepted that, as a matter of state law, Lambatos's testimony based on the Cellmark report was not admitted to prove the truth of the matter asserted. (*Williams v. Illinois*, *supra*, 567 U.S. at pp. 57, 69-80 [lead opn. of Alito, J.].) Separately and alternatively, he also concluded that the Cellmark report was not testimonial. (*Id*. at pp. 57, 81-86.)

Justice Kagan authored the dissenting opinion, also joined by three other justices. In her view, as a matter of federal constitutional law, Lambatos's challenged testimony was admitted to prove the truth of the matter asserted. (*Williams v. Illinois*, *supra*, 567 U.S. at pp. 125-132 [dis. opn. of Kagan, J.].) "[W]hen a witness, expert or otherwise,

repeats an out-of-court statement as the basis for a conclusion, . . . the statement's utility is then dependent on its truth.  If the statement is true, then the conclusion based on it is probably true; if not, not.  So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. . . . [A]dmission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it *except* assess its truth and so the credibility of the conclusion it serves to buttress." (*Id*. at pp. 126-127.)  Justice Kagan then further concluded that the Cellmark report was testimonial.  (*Id*. at pp. 132-141.)

Finally, Justice Thomas wrote a separate opinion concurring solely in the judgment.  He agreed with the dissent that the challenged testimony was admitted to prove its truth.  (*Williams v. Illinois*, *supra*, 567 U.S. at pp. 104-109 [conc. opn. of Thomas, J.].)  "[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose.  There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." (*Id*. at p. 106.)  However, he agreed with the lead opinion that the Cellmark report was not testimonial (*id*., at pp. 109-118), though for different reasons.  (*Id*. at p. 111.)

C.     *Dungo*.

Later in 2012, the California Supreme Court addressed similar issues in *People v. Dungo* (2012) 55 Cal.4th 608.  There, the autopsy of the victim had been performed by one Dr. Bolduc.  (*Id*. at p. 613.)  When the defendant was tried for murder, however, one Dr. Lawrence, who had not been present at the autopsy, gave expert opinion testimony

based on his review of Dr. Bolduc's autopsy report and autopsy photos. (*Id*. at pp. 614-615.) Thus, he testified that, in his opinion, the victim was strangled to death slowly, as shown by pinpoint hemorrhages in her eyes, neck hemorrhages, the purple color of her face, her bitten tongue, and her unbroken hyoid bone. (*Id*. at p. 614.) The autopsy report and the autopsy photos were not introduced. (*Id*. at pp. 614-615.)

By signing the majority opinion, five justices agreed that there was no *Crawford* violation because the contents of the autopsy report, as relayed by Dr. Lawrence, were not testimonial. (*People v. Dungo*, *supra*, 55 Cal.4th at pp. 618-621.) The majority opinion did not specifically discuss whether this evidence was offered for its truth.

Four of those five justices, however, also signed a concurring opinion by Justice Werdegar, which did address this issue. It stated: "Dr. Lawrence relayed to the jury certain physical observations recorded by Dr. Bolduc in his report of the autopsy, using those observations to support Dr. Lawrence's own expert opinions as to the cause and manner of death. *Dr. Bolduc's observations were introduced for their truth*, and since Dr. Bolduc was not shown to be unavailable and had not been subject to prior cross-examination on this matter by defendant, his statements, were they testimonial, would have been inadmissible under *Crawford*." (*People v. Dungo*, *supra*, 55 Cal.4th at p. 627 [conc. opn. of Werdegar, J.], italics added.)

The remaining two justices (Corrigan and Liu) dissented, concluding that the contents of the autopsy report were testimonial. (*People v. Dungo*, *supra*, 55 Cal.4th at pp. 641-646 [dis. opn. of Corrigan, J.].) However, they further concluded: "When an expert witness treats as factual the contents of an out-of-court statement, and relates as

56

true the contents of that statement to the jury, a majority of the high court in *Williams* . . . rejects the premise that the out-of-court statement is not admitted for its truth." (*Id*. at p. 635, fn. 3.)

#### D. *Sanchez.*

This brings us to *Sanchez.* There, a gang expert's opinion that the defendant was a gang member was based, in part, on records created by other police officers, which recounted their contacts with the defendant. (*People v. Sanchez, supra,* 63 Cal.4th at pp. 672-673.) On appeal, the defendant argued that the admission of the expert's testimony about the content of these records violated *Crawford*. (*Id*. at p. 674.)

The Supreme Court stated: "We first address whether facts an expert relates as the basis for his opinion are properly considered to be admitted for their truth. The confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]" (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 674.)

"The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 676.) "By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried. Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts. An expert may then testify about more generalized information to help jurors

57

understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge. [Citation.]" (*Ibid.*)

The court then discussed *Williams*. (*People v. Sanchez*, *supra*, 63 Cal.4th at pp. 681-683.) It noted: "The reasoning of a majority of justices in *Williams* calls into question the premise that expert testimony giving case-specific information does not relate hearsay." (*Id*. at p. 683.) Rather, under the reasoning of both the dissent and Justice Thomas's concurrence, an expert's testimony to case-specific facts based on hearsay is offered for its truth. (*Id*. at pp. 682-683.) The court concluded: "We find persuasive the reasoning of a majority of justices in *Williams*." (*Id*. at p. 684, fn. omitted.) It therefore held that "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay." (*Ibid.*)

By contrast, the court allowed an expert to testify freely to non-case-specific hearsay when it is the basis for his or her opinion: "Our decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. Indeed, an expert's background knowledge and experience is what distinguishes him from a lay witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth." (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 685.)

58

E.    *Discussion.*

In *Williams*, in 2012, a total of five justices of the United States Supreme Court expressed the view that, at least for purposes of the confrontation clause, an expert's testimony to the hearsay on which his or her opinion is based is offered for its truth.  At a minimum, as the court in *Sanchez* stated, their reasoning "call[ed] into question the premise that expert testimony giving case-specific information does not relate hearsay." (*People v. Sanchez, supra*, 63 Cal.4th at p. 683.)  Moreover, *Sanchez* expressly relied on the reasoning of *Williams*.

Then in *Dungo*, also in 2012, six justices of the California Supreme Court likewise agreed that, when an expert relates an out-of-court statement as the basis for his or her opinion, that statement is necessarily admitted for its truth.

In May 2013, *People v. Mercado* (2013) 216 Cal.App.4th 67 stated:  "'[A] five justice majority of the high court and at least six of the seven justices on the California Supreme Court appear to agree that, for purposes of the confrontation clause, out-of-court statements admitted as basis evidence during expert testimony are admitted for their truth if treated as factual by the expert . . . .'  [Citation.]" (*Id.* at p. 89, fn. 6.)

Admittedly, *Williams*, *Dungo*, and *Mercado* did not anticipate the distinction that *Sanchez* ultimately drew between case-specific and non-case-specific hearsay.  If anything, they suggested that *any* hearsay that is offered as the basis for an expert's opinion testimony is *necessarily* offered for its truth.  Thus, they alerted competent and knowledgeable counsel to the need to object to such evidence on hearsay and *Crawford* grounds.  They also meant that such objections would not have been futile.

59

Significantly, in arguing that *Crawford* prohibits an expert from acting as a conduit for hearsay, Chavez himself relies on various pre-*Sanchez* authorities, including *United States v. Gomez* (9th Cir. 2013) 725 F.3d 1121, 1129, *United States v. Pablo* (10th Cir. 2012) 696 F.3d 1280, 1288, and *United States v. Lombardozzi* (2d Cir. 2007) 491 F.3d 61, 72.

We therefore conclude that the failure of Chavez's trial counsel to object on these grounds below constituted a forfeiture. Chavez does not contend that his trial counsel's failure to object constituted ineffective assistance of counsel. Hence, we are not called upon to discuss this contention.

XI

ERRONEOUS INSTRUCTIONS REGARDING THE INTENT REQUIREMENT

FOR AIDING AND ABETTING PREMEDITATED MURDER

Perez contends that the jury was erroneously allowed to find him guilty of premeditated first degree murder, as an aider and abettor, under the natural and probable consequences doctrine.

A. *Additional Factual and Procedural Background*.

1. *Aiding and abetting instructions*.

Perez's jury was instructed on the natural and probable consequences doctrine as it applies to aiding and abetting, as follows:

"Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.

60

"To prove that a defendant is guilty of Murder and Attempted Murder, the People must prove that:

"1. The defendant is guilty of Kidnapping for Ransom And Kidnapping for Robbery;

"2. During the commission of Kidnapping for Ransom And Kidnapping for Robbery, a co-participant in that Kidnapping for Ransom And Kidnapping for Robbery committed the crime of Murder and Attempted Murder;

"AND

"3. Under all the circumstances, a reasonable person in the defendant's position would have known that the [c]ommission of Murder and Attempted Murder was a natural and probable consequence of the commission of the Kidnapping for Ransom And Kidnapping for Robbery." (CALCRIM No. 402.)

2. *Conspiracy instructions.*

Perez's jury was also instructed on conspiracy, using CALCRIM No. 416. This instruction stated that the defendant could be found guilty of murder as a conspirator only if he "intended to agree and did agree with one or more of the other defendants to commit Murder, Kidnapping, and Robbery . . . ."

The trial court did not give CALCRIM No. 417 (2013), which would have instructed that a member of a conspiracy to commit one crime can also be found guilty of another crime if it "is a natural and probable consequence of the common plan or design of the conspiracy."

3.      *First degree murder instructions.*

Perez's jury was also instructed on first degree murder, as follows:

"If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder in the first degree as defined in CALCRIM numbers 521, 540A, and/or 540B."  (CALCRIM No. 520.)

CALCRIM No. 521 addressed the willful, deliberate, and premeditated theory of first degree murder.  As relevant here, it stated:

"A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted willfully if he intended to kill.

"The defendant acted deliberately if he carefully weighed in the considerations for and against his choice, and knowing the consequences, decided to kill.

"The defendant acted with premeditation if he decided to kill before completing the act that caused death."

CALCRIM No. 521 also addressed the lying-in-wait theory of first degree murder.  CALCRIM Nos. 540A and 540B addressed the felony-murder theory of first degree murder.

B.      *Discussion.*

After defendants were tried and sentenced, the California Supreme Court decided *People v. Chiu*, *supra*, 59 Cal.4th 155 (*Chiu*).  *Chiu* held that an aider and abettor cannot be convicted of first degree murder unless he or she personally premeditated and had the

intent to kill; in other words, it held that the natural and probable consequences doctrine does not apply to the degree of first degree murder. (*Id*. at pp. 158-159, 166-167.)

As the People concede, *Chiu* is retroactive. (*In re Brigham* (2016) 3 Cal.App.5th 318, 327, fn. 4.)

Here, the trial court correctly instructed that the jury could find the defendant guilty of *murder*, if he was an aider and abettor, under the natural and probable consequences doctrine. It also correctly instructed that the jury could find the defendant guilty of *first degree* murder under a willful, deliberate, and premeditated murder theory only if the "*defendant* . . . acted willfully, deliberately, and with premeditation." (Italics added.)

This wording was significantly different from CALCRIM No. 521 as given in *Chiu*, which stated that the jury could find the defendant guilty of first degree murder under a premeditated murder theory as long as "the *perpetrator* acted willfully, deliberately, and with premeditation . . . ." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 161, italics added.) Hence, unlike in *Chiu*, if the jury found a defendant guilty of first degree murder under a premeditation theory at all, it necessarily did so because it found that that defendant personally premeditated.

*Chiu* has been held to require personal premeditation by conspirators as well as aiders and abettors. (*People v. Rivera* (2015) 234 Cal.App.4th 1350, 1356-1357.) However, the trial court did *not* instruct that the jury could find defendant guilty of murder, if he was a conspirator, under the natural and probable consequences doctrine. Even if it had done so, we would conclude that it did not err, because it further instructed

63

that the jury could not find defendant guilty of first degree murder unless he personally premeditated.

XII

ERRONEOUS INSTRUCTIONS ON

CONSPIRACY TO COMMIT ATTEMPTED MURDER

Perez contends that the trial court erred by instructing that he could be guilty of attempted murder on a conspiracy theory.

A.    *Additional Factual and Procedural Background.*

Perez's jury was instructed:

"A member of a conspiracy is criminally responsible for the acts and statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy.

"To prove that a defendant was a member of a conspiracy in this case, the People must prove that:

"1.  The defendant intended to agree and did agree with one or more of the other defendants to commit Murder, Kidnapping, and Robbery;

"2.  At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit Murder, Kidnapping and Robbery;

"3.  One of the defendants or all of them committed at least one of the following overt acts to accomplish Murder, Attempted Murder, Kidnapping for Ransom or Kidnapping for Robbery[:]  [¶]  [List of alleged overt acts.]

"AND

"4. At least one of these overt acts was committed in California[.]" (CALCRIM No. 416.)

B. *Discussion.*

The crime of conspiracy to commit attempted murder does not exist. "This is because the crime of attempted murder requires a specific intent to actually commit the murder, while the agreement underlying [such a] conspiracy . . . contemplate[s] no more than an ineffectual act. No one can simultaneously intend to do and not do the same act, here the actual commission of a murder." (*People v. Iniguez* (2002) 96 Cal.App.4th 75, 79.)

"Stated another way, under a traditional conspiracy approach, one cannot conspire to *try* to commit a crime. An agreement to commit a crime is required, even if nothing more than an overt act is ultimately done." (*People v. Johnson* (2013) 57 Cal.4th 250, 264.)

Here, the jury was not dealing with conspiracy as a substantive offense (Pen. Code, § 182), but rather with conspiracy as a theory of vicarious criminal liability. (See *In re Y.R.* (2014) 226 Cal.App.4th 1114, 1121.) Nevertheless, for the reasons stated in *Iniguez* and *Johnson*, such a conspiracy to commit attempted murder is likewise a legal impossibility.

The jury here, however, was not instructed that Perez could be found guilty of attempted murder if he entered into a conspiracy to commit attempted murder. To the contrary, it was instructed that he was "criminally responsible" for attempted murder on a conspiracy theory only if, among other things, (1) he entered into a conspiracy to commit

"Murder, Kidnapping, and Robbery," and (2) another member of the conspiracy committed attempted murder "to help accomplish the goal of the conspiracy."

Admittedly, the instruction also required that some member of the conspiracy commit an overt act "to accomplish Murder, *Attempted Murder*, Kidnapping for Ransom or Kidnapping for Robbery." (Italics added.) However, for the same reasons that it is *legally* impossible to intend to accomplish attempted murder, it is also *factually* impossible. Hence, we may assume that the jury found that a member of the conspiracy intended to accomplish murder or kidnapping, rather than attempted murder. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Indeed, on these facts, it would be absurd to suppose that the person or persons who shot Romero did not intend to kill him.

XIII

FAILURE TO INSTRUCT ON

THE FINANCIAL-GAIN SPECIAL CIRCUMSTANCE

Defendants contend that the trial court failed to instruct on the financial-gain special circumstance. (E.g., CALCRIM No. 720.) The People concede the error. We agree.

"A trial court has a sua sponte duty to instruct the jury on the essential elements of a special circumstance allegation [citation] . . . ." (*People v. Mil* (2012) 53 Cal.4th 400, 409.)

A financial-gain special circumstance applies when a "murder was intentional and carried out for financial gain." (Pen. Code, § 190.2, subd. (a)(1).) Admittedly, the trial court has no sua sponte duty to define financial gain. (*People v. Howard* (1988) 44

66

Cal.3d 375, 408-409.) Also, while it failed to instruct that this special circumstance required that the murder be intentional, it is arguable that that error was harmless.[15] However, when a robbery-murder special circumstance is also alleged, the trial court has a duty to clarify that "the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to the financial gain sought by the defendant." (*People v. Bigelow*, *supra*, 37 Cal.3d at p. 751; see also Bench Notes to CALCRIM No. 720.) The trial court did not do so.

We cannot say that the omission of this clarification was harmless, because the jury could well have concluded that defendants expected financial gain from robbing the victims. Thus, we must reverse the financial-gain special circumstance.

XIV

ERRONEOUS INSTRUCTIONS ON

THE MULTIPLE-MURDER SPECIAL CIRCUMSTANCE

Defendants contend that the trial court failed to instruct that the multiple-murder special circumstance, as to an aider and abettor, requires the intent to kill.

---

[15] The trial court did instruct that several of the charged special circumstances — specifically including the financial-gain special circumstance — required that a defendant *either* be the actual killer *or* have the intent to kill. (CALCRIM No. 702; see part XIII, *post*.) This was erroneous with regard to the financial gain special circumstance, which requires the intent to kill. (See Bench Notes to CALCRIM No. 702.)

As to Chavez and Perez, however, there was no evidence that either of them was an actual killer; thus, the jury must have found that they had the intent to kill. As to Sandoval, the jury could have concluded that he was an actual killer because his sweatshirt was found in the pickup with the bodies; nevertheless, given the facts, it could not very well have found that the actual killers acted without the intent to kill.

67

A.    *Additional Factual and Procedural Background.*

The trial court instructed both juries:

"If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance of Murder by an Active Participant of a Criminal Street Gang . . . , Murder for Financial Gain, [and] Murder by Means of Lying in Wait, . . . you must also decide whether the defendant acted with the intent to kill.

"In order to prove this special circumstance for a defendant who is not the actual killer, but who is guilty of first degree murder as an aider and abettor or a member of the conspiracy, the People must prove that the defendant acted with the intent to kill.

"The People do not have to prove that the actual killer acted with the intent to kill in order for this special circumstance to be true.

"If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find this special circumstance true, you must find that the defendant acted with the intent to kill.

"If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted with the intent to kill for the special circumstance of Murder by an Active Participant of a Criminal Street Gang, Murder for Financial Gain, and Murder by Means of Lying in Wait to be true.  If the People have not met this burden, you must find this special circumstance has not been proved true for that defendant."  (CALCRIM No. 702.)

68

It did not give this or any similar instruction regarding the multiple-murder special circumstance. (Pen. Code, § 190.2, subd. (a)(3).)

B.      *Discussion.*

"When there is evidence from which a jury could base its convictions for multiple counts of murder on the theory that the defendant was guilty as an aider and abettor, and not as the actual perpetrator, the trial court must instruct the jury that to find true a multiple-murder special-circumstance allegation as to that defendant, it must find that the defendant intended to kill the murder victims. [Citations.]" (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45.) This the trial court failed to do.

The People concede the error. They contend, however, that it was harmless beyond a reasonable doubt.

The failure to instruct that a special circumstance requires the intent to kill is harmless "if the factual question not posed to the jury by the failure to instruct on intent was necessarily resolved adversely to defendant under other, properly given instructions. [Citation.]" (*People v. Garrison* (1989) 47 Cal.3d 746, 789-790.)

Here, the jury also found a financial-gain special circumstance (Pen. Code, § 190.2, subd. (a)(1)), a lying-in-wait special circumstance (Pen. Code, § 190.2, subd. (a)(15)), and a gang special circumstance (Pen. Code, § 190.2, subd. (a)(22)) to be true. As just noted, it was instructed that, to find these special circumstances true, it had to find that the defendant either was the actual killer or acted with the intent to kill. Hence, we can be sure beyond a reasonable doubt that the failure to give a similar instruction regarding the multiple-murder special circumstance was harmless. (*People v. Garrison*,

69

*supra*, 47 Cal.3d at pp. 789-791 [failure to instruct that multiple-murder special circumstance required intent to kill was harmless given true finding on witness-killing special circumstance, which, as jury was instructed, required intent to kill].)

## XV

## FAILURE TO INSTRUCT ON THE ESCAPE RULE

In part IV.B, *ante*, we held that there was sufficient evidence that a kidnapping was still underway when the shooting occurred. Perez, however, also contends that there was sufficient evidence that a kidnapping was *not* still underway to require the trial court to instruct on the escape rule for purposes of felony murder.[16]

A.    *Additional Factual and Procedural Background*.

As already mentioned, the trial court gave CALCRIM Nos. 540A and 540B concerning felony-murder. CALCRIM No. 540B, as relevant here, stated:

"The defendants may also be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator.

"To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed, or aided and abetted, or was a member of a conspiracy to commit Kidnapping for Ransom or Kidnapping for Robbery;

---

[16]    Perez does *not* contend that the trial court erred by failing to instruct on the escape rule for purposes of the robbery-murder or kidnapping-murder special circumstances. We deem any such contention forfeited.

70

"2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, or intended that one or more of the members of the conspiracy commit Kidnapping for Ransom or Kidnapping for Robbery;

"3. If the defendant did not personally commit Kidnapping for Ransom or Kidnapping for Robbery, then a perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed Kidnapping for Ransom or Kidnapping for Robbery;

"AND

"4. While committing [or attempting to commit] Kidnapping for Ransom or Kidnapping for Robbery, the perpetrator caused the death of another person. [¶] . . . [¶] . . .

"It is not required that the person die immediately, as long as the cause of death and the felonies are part of one continuous transaction."

The trial court omitted optional bracketed language from CALCRIM No. 540A (Aug. 2013 supp.) that would have stated: "The crimes of Kidnapping for Ransom or Kidnapping for Robbery continue until a defendant has reached a place of temporary safety." (*Ibid*. [with case-specific insertions].)

B.      *Discussion*.

"'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.]" (*People v. Townsel* (2016) 63 Cal.4th 25, 58.)  However, "[t]rial courts are duty-bound to avoid instructions which are not

71

justified by the facts of the case, since they have a natural tendency to overburden and confuse the jury.  [Citations.]" (*People v. Singleton* (1987) 196 Cal.App.3d 488, 492.) Accordingly, the trial court need not instruct on the escape rule when the evidence establishes as a matter of law that the underlying felony was still in progress when the murder occurred.[17]

As discussed in part IV.B, *ante*, the kidnappings were still underway when the shooting occurred, because the victims were detained by and under the control of Perez's accomplices.  There was no substantial evidence to the contrary.  As also discussed, the fact that Perez himself may have reached a place of temporary safety is legally irrelevant to this question.

We therefore conclude that the trial court did not err by failing to instruct on the escape rule.

XVI

FAILURE TO INSTRUCT ON THE DEFENSE OF DURESS

Perez contends that the trial court erred by failing to instruct sua sponte on duress as a defense.

---

[17]    Perez asserts that there is a sua sponte duty to instruct on the escape rule, citing *People v. Wilkins*, *supra*, 56 Cal.4th 333.  *Wilkins*, however, merely held that there is a duty to instruct on the escape rule *on request*.  (*Id*. at p. 59.)  We need not decide whether the duty also exists sua sponte.

A.    *Additional Factual and Procedural Background.*

Iniguez testified that the other participants trusted him and Perez because "they knew . . . how to get back to us," meaning that they knew how to kidnap, torture, and kill them.

At the meeting at El Pollo Loco, Iniguez and Perez were told that they "would have to go along with it," or else they would meet the same fate as the victims.

Perez told the police that, before leaving in the truck containing the victims, Sandoval told him, "[I]f you say something or do something . . . we're gonna do the same thing we did to them to you and your family."

When the police asked Perez why he did not call the police "afterwards," he said he was "scared"; if the others found out that he "snitched," they would "probably get [his] mom . . . ."

B.    *Discussion.*

"The defense of duress is available to defendants who commit crimes, except murder, 'under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.' [Citations.]  Although 'duress is not a defense to any form of murder,' [citation] 'duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. [Citations.]  If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony.' [Citation.]  A trial court is required to instruct sua sponte on a duress defense if there is substantial evidence of the defense and

73

if it is not inconsistent with the defendant's theory of the case.  [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 331.)

"'Duress is an effective defense only when the actor responds to an immediate and imminent danger.'  [Citation.] . . .  ' . . . A "phantasmagoria of future harm" such as a threat of death to be carried out at some undefined time, will not diminish criminal culpability.'  [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1460; accord, *People v. Casares* (2016) 62 Cal.4th 808, 844.)

For example, in *People v. McKinney* (1986) 187 Cal.App.3d 583, the defendant, a prison inmate, hit a fellow inmate in the head with a hammer during metal shop class. (*Id*. at p. 585.)  The trial court excluded evidence, offered to support a duress defense, that other inmates had threatened to kill him if he failed to use violence to settle his dispute with the victim (and also if he went into protective custody).  (*Id*. at pp. 585, 587.)  The appellate court upheld this ruling:  "The other inmates who had threatened defendant were not present in the shop class at the time.  In short, defendant's offer of proof established at most a threat of future harm if he failed to confront [the victim]. Thus, the trial court did not err in excluding the offered evidence."  (*Id*. at pp. 587-588.)

Here, similarly, there was no evidence of any threat of immediate harm.  At most, the evidence showed that, if Perez failed or refused to participate, the others would attempt to kill him and/or his family members sometime in the future.

We therefore conclude that the trial court did not err by failing to instruct on duress as a defense.

XVII

PROSECUTORIAL MISCONDUCT

BY MISSTATING THE LAW IN CLOSING ARGUMENT

Perez contends that, in closing argument, the prosecutor advanced several legally invalid theories of attempted murder.

A.     *Additional Factual and Procedural Background*.

In closing argument to Perez's jury, the prosecutor stated:

"[R]emember . . . the hypothetical of how we develop a bank robbery?  Remember that?[18]  Where the person who comes up with the idea and actually commits the robbery is the principal but when you get someone to act as a getaway driver, that person is aiding and abetting?  While they get someone to agree to do it ahead of time, maybe provides a gun or something like that, that becomes a conspiracy, when you have . . . two or more agreeing?

"All of these principles are at play here.  All of them apply to this defendant in one form or another to make him guilty of *these crimes*."  (Italics added.)

Later, he stated:  "We've given you three possible ways to get to first degree murder as to Jose Perez. . . .  [T]hree theories, felony murder, lying in wait and willful, deliberate and premeditated.  We've also given you three different ways to ascribe that liability to him[,] as a direct actor in the felony committed, as a co-conspirator, and as an aider and abettor."

---

**18**     Apparently, this referred to something that was said during jury selection and therefore is not in the normal record.

In a digression covering about one transcript page, he predicted that Perez's counsel would argue that Perez "was just the babysitter roped into something over his head that he had no control over." He argued that, to the contrary, at the El Pollo Loco meeting, Perez made a "free choice" to become "an active participant in [c]artel business."

He then said: "Why is count 3 attempted murder? Because by the grace of God or fate, or whatever intervened that night, Luis Romero survived. They surely intended to kill him just like Alejandro Martin and Eduardo Gomez. . . .

"So for *all the things* that we just talked about, or *I just talked about to you about why it's a murder apply to why it's an attempted murder* with just the one coincidence or odd fact that he survived . . . ." (Italics added.)

B.    *Discussion*.

Perez argues that felony murder, lying in wait, and conspiracy are not legally valid theories of attempted murder.

He "is correct . . . that the felony-murder rule has no application to a charge of attempted murder. An attempted murder requires the intent to take a human life — an element which cannot be supplied by the application of the felony-murder rule. [Citation.]" (*People v. Wein* (1977) 69 Cal.App.3d 79, 92.)

He is also correct that lying in wait is inapplicable to attempted murder. The fact that a murder is committed by lying in wait will elevate what would otherwise be a second degree murder to a first degree murder. (Pen. Code, § 189.) Thus, a murder committed by lying in wait is first degree murder, even if it is committed with only

76

implied malice, i.e., without the intent to kill. (*People v. Laws* (1993) 12 Cal.App.4th 786, 793-794.) By contrast, attempted murder is not divided into degrees and, as mentioned, it does require the intent to kill.

And, as discussed in part XII, *ante*, he is correct that there is no such thing as a conspiracy to commit attempted murder.

Thus, Perez is essentially arguing that the prosecutor misstated the law. "[S]uch an error would merely amount to prosecutorial misconduct [citation] during argument, rather than trial and resolution of the case on an improper legal basis.

"When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal. [Citation.]

"Defendant made no objection to the prosecutor's remarks and thus has waived his claim." (*People v. Morales* (2001) 25 Cal.4th 34, 43-44 (*Morales*); accord, *People v. Nguyen* (2015) 61 Cal.4th 1015, 1046-1047.)

Perez argues that the error is not waived because it is analogous to an instructional error, citing *People v. Guiton*, *supra*, 4 Cal.4th 1116 and *People v. Green* (1980) 27 Cal.3d 1, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239. In *Morales*, however, the Supreme Court stated: "*Guiton* and *Green* are unlike this case in that in each of them, the court presented the state's case to the jury on an erroneous legal theory or theories. In *Green*, the instructions were deficient . . . ." (*Morales*, *supra*, 25 Cal.4th at p. 43.) "In *Guiton*, too, a theory unsupported by evidence was presented to the jury in the very trying of the case — [the defendant] was charged with selling cocaine

77

despite a lack of evidence that he engaged in this conduct. Again, the trial court should have modified the instructions in light of this fact." (*Ibid*.) "In this case, by contrast, the court did not present to the jury a case that was premised on a legally incorrect theory." (*Ibid*.) Here, similarly, the trial court was not involved in the misstatement.

Perez also argues that his trial counsel's failure to object to the prosecutor's misstatement constituted ineffective assistance.

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance. [Citation.] To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance " " " "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' " [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. [Citations.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)

Here, the jury specifically found, as to each defendant, that in the commission of the attempted murder, "the defendant acted with willful, deliberate premeditation . . . ." It had been instructed that, for purposes of attempted murder, premeditation requires the intent to kill. (CALCRIM No. 601.) It necessarily follows that, even assuming the jury *might* have found defendants guilty of attempted murder on a legally *invalid* theory, it *also* found them guilty on the legally *valid* theory of intent to kill. Accordingly, defense counsel's failure to object was not prejudicial.

78

XVIII

PROSECUTORIAL COMMENT ON DEFENDANTS' FAILURE TO TESTIFY

Sandoval and Chavez[19] contend that the prosecutor violated their right to remain silent by commenting on their failure to contradict Iniguez's testimony.

A.     *Additional Factual and Procedural Background.*

During his rebuttal argument to Sandoval and Chavez's jury, the prosecutor noted that Chavez's counsel had argued that his client was coerced into participating, citing Iniguez's testimony that he himself felt coerced.  He then said:

"But you heard zero evidence that that is what [Chavez] was thinking, or that is what [Chavez] was told, or that's anything that was impressed upon him in his actions in this case."

"And what [Sandoval's counsel] did was stand up here and give you rank speculation as to people's state of mind, inferences from evidence that is not there, and ignored evidence that was there."

"[Y]ou never heard one piece of evidence to contradict anything [Iniguez] said."

"And that credibility of Mr. Iniguez, there was nothing to impeach him.  There was nothing to show that anything he said was wrong, inconsistent, contradictory."

"Again, there was no evidence to contradict Mr. Iniguez."

"It's that evidence, the cell phone evidence and the DNA that independently connect . . . Sandoval to these crimes.  It's that evidence that then allows you to consider

---

**19**     We do not understand Perez to be joining in this contention, because it concerns the prosecutor's remarks to Sandoval and Chavez's jury, not to Perez's jury.

. . . Iniguez's testimony, that uncontradicted, unimpeached, unaltered, unquestioned, testimony.

"Was there any question that was asked of . . . Iniguez on cross-examination by either attorney that changed the scenario, the facts, the parties involved or how it occurred? Nope. Was any independent evidence brought in by them or me from detectives, independent witnesses, prior statements, prior testimony, anything that changed how it went down, who it went down with or by, and the end result? No. Absolutely not."

After the prosecutor finished, outside the presence of the jury, Chavez's counsel objected, "the D.A. during . . . his rebuttal argument place[d] the burden on the defendants to disprove the charge."

The trial court asked, "Is there something . . . that you would like me to do in terms of this jury?" He replied, "I think just . . . stressing the CALCRIM that we don't have any burden of proof here . . . ." Sandoval's counsel then joined in the objection.

After a lunch break, Chavez's counsel restated his argument. Sandoval's counsel added, "I don't think it's a fair comment for the prosecutor to make a comment as to how we exercise our right of confrontation. And [that] we didn't exercise it . . . . [¶] That also tramples on the right of self-incrimination."

Again, the trial court asked, "Is there any remedy . . . ?" Chavez's counsel replied, "You've already indicated . . . that you're going to read, you know, the issue of the burden of proof, et cetera. I would submit to that." Sandoval's counsel added, "I'll submit . . . ."

80

After the jury retired to deliberate, the trial court stated, "Yesterday there was a comment from both [Chavez's counsel] and [Sandoval's counsel] about the possibility of during his closing argument, [the prosecutor] may have done something to infer that Mr. Chavez . . . and/or Mr. Sandoval should take the stand . . . ." The court and counsel agreed that this issue invoked *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).

The court then stated, "[I]t struck me that you need a ruling . . . ." Accordingly, it ruled: "I don't find that it was prosecutorial misconduct. I don't find that it was an improper unconstitutional comment on the right of the defendants to remain silent."

B.      *Discussion*.

1.      *Forfeiture*.

"A defendant cannot complain on appeal of error by a prosecutor unless he or she made an assignment of error on the same ground in a timely fashion in the trial court and requested the jury be admonished to disregard the impropriety. [Citations.] This procedural requirement has been applied repeatedly to cases involving claims of *Griffin* error. [Citations.]" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1006-1007.)

Here, defense counsel did not object during the prosecutor's argument. They objected only after the prosecutor had finished. Even then, when the trial court asked them what they wanted it to do, they did not request an admonition. They agreed that the standard CALCRIM instructions concerning the burden of proof would be an adequate remedy. Thus, they forfeited the present contention. Sandoval and Chavez do not claim that this forfeiture constituted ineffective assistance; hence, we have no occasion to consider any such claim.

81

2.     *Merits*.

Separately and alternatively, we also reject this contention on the merits.

"""'[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.'"'  [Citations.]"  (*People v. Jackson* (2016) 1 Cal.5th 269, 368.)

Under *Griffin*, the Fifth Amendment prohibits the prosecution from commenting on a defendant's failure to testify at trial.  (*Griffin*, *supra*, 380 U.S. at p. 615.)  Thus, "[t]he prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide.  [Citation.]"  (*People v. Brady* (2010) 50 Cal.4th 547, 565-566.)

"'Although a prosecutor is forbidden to comment "'either directly or indirectly, on the defendant's failure to testify in his defense,'" the prosecutor may comment "'on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses.'"  [Citation.]'  [Citation.]"  (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1333.)  """'[A]s a general principle, prosecutors may allude to the defense's failure to present exculpatory evidence" [citation], and such commentary does not ordinarily violate *Griffin* or erroneously imply that the defendant bears a burden of proof.'"' [Citations.]"  (*People v. Carr* (2010) 190 Cal.App.4th 475, 483.)

The prosecutor's statements to the effect that Iniguez's testimony had not been impeached or contradicted were appropriate comments on the state of the evidence. Defendants themselves were not the only ones who could confirm or deny that testimony.

82

Victim Romero's out-of-court statements describing the crimes corroborated it. Garcia, testifying pursuant to a plea agreement, also corroborated Iniguez. Alvarado's out-of-court statements, introduced through Garcia, further corroborated Iniguez. The DNA evidence and cell phone evidence were both consistent with Iniguez's account.

In addition, under *People v. Ford* (1988) 45 Cal.3d 431, the prosecutor could properly comment on the failure of Alvarado and Rodriguez, who had already been separately convicted, to testify in this case. In *Ford*, defendants Ford, Cooper, and Elder were all charged with committing the same burglary. When Ford went to trial, Cooper had pleaded guilty, and Elder had not yet been tried. (*Id*. at p. 436.) Ford took the stand and testified that, at various times when prosecution witnesses placed him at the scene of the burglary (*id*. at pp. 436-437), he was actually somewhere else with Cooper and/or Elder. (*Id*. at pp. 437-438.) In closing argument, the prosecutor commented on Ford's failure to call Cooper and Elder to support his alibi. (*Id*. at p. 438.)

The Supreme Court held that there was no "statute, constitutional provision, or rule [that] precludes comment by the prosecutor on defendant's failure to call his former codefendants as witnesses to support his alibi defense." (*People v. Ford*, *supra*, 45 Cal.3d at p. 435; see also *id*. at pp. 442-447.) It noted that, assuming Ford's testimony that he had an alibi was true, the witnesses' testimony would not incriminate them. (*Id*. at p. 442.) And even if their testimony would incriminate them, they might be willing to waive the privilege in order to give testimony that would exculpate Ford. (*Id*. at pp. 442-443.) Thus, it was Ford's burden to call these witnesses and thus to force them either to testify or to assert their Fifth Amendment privilege. (*Id*. at pp. 442-443.) Alternatively,

he could have sought a stipulation or a ruling before trial that comment would be impermissible because the witnesses were unavailable. (*Id*. at pp. 447-448.)

Here, similarly, if Alvarado or Rodriguez could have contradicted Iniguez's testimony, defendants would have called them. Defendants did not show that these witnesses would have claimed the Fifth Amendment[20] and did not seek a ruling or a stipulation that they were unavailable. Hence, the prosecutor could point out that Iniguez was uncontradicted without necessarily alluding to defendants' own failure to testify.

Finally, defendants did not put on an affirmative case; they did not introduce *any* evidence, other than that which they elicited from prosecution witnesses on cross-examination. Again, the prosecutor was entitled to point this out.

The prosecutor's statement that there was no evidence of what Chavez was thinking or of what Chavez was told comes closest to a *Griffin* violation, because obviously Chavez himself could have provided such evidence. However, others, including Iniguez, Alvarado, and Rodriguez, could have testified to what was said in Chavez's presence; they could have testified to what Chavez did; and, subject to hearsay limitations, they could also have testified to what, if anything, Chavez said. (See, e.g., Evid. Code, § 1241 [hearsay exception for statement explaining declarant's conduct].) Thus, the prosecutor could properly argue that there was no evidence that Chavez was coerced into participating.

We therefore conclude that there was no *Griffin* violation.

---

[20]     Significantly, in *Ford*, the Supreme Court did not simply assume that Cooper's testimony would incriminate him, even though he had already pleaded guilty.

XIX

FAILURE TO STATE REASONS FOR THE UPPER TERM

Defendants contend that the trial court erroneously failed to state reasons for imposing the upper term for active gang participation.

The authorized sentence for active gang participation is either 16 months, two years, or three years in prison. (Pen. Code, § 186.22, subd. (a).) "[A] trial court is required to state its reasons for any sentencing choice (e.g., imposition of an upper term) on the record at the time of sentencing. [Citations.]" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1371; see Pen. Code, § 1170, subd. (b); Cal. Rules of Court, rule 4.420(e).) Here, the trial court imposed the upper term of three years without stating any reasons.

The People argue, however, that defendants forfeited the issue by failing to raise it below. We agree. "[D]efects in the trial court's statement of reasons are waived unless challenged at the time of sentencing." (*People v. Scott* (1994) 9 Cal.4th 331, 348.) "Included in this category are . . . cases in which the court purportedly erred because it . . . failed to state any reasons . . . ." (*Id*. at p. 353.)

We do not mean to suggest that this contention, if not forfeited, would have merit. Defendants' respective probation reports noted multiple aggravating factors, including great violence (Cal. Rules of Court, rule 4.421(a)(1)), arming or use of a weapon (*id*., rule 4.421(a)(2)), planning, sophistication, and professionalism (*id*., rule 4.421(a)(8)), a taking of great monetary value (*id*., rule 4.421(a)(9)), a large quantity of contraband (*id*., rule 4.421(a)(10)), and the abuse of trust or confidence (*id*., rule 4.421(a)(11)). While the

85

reports noted the absence of some potential aggravating factors, they found no mitigating factors other than the lack of a prior criminal record. (Cal. Rules of Court, rule 4.423(b)(1).) Thus, the probation reports recommended the upper term.

If defense counsel had insisted that the trial court state reasons, presumably it would have stated the reasons listed in the probation reports. While there might have been some room to quibble over whether every factor applied to every defendant, it seems inescapable that the trial court would still have found that the aggravating factors were compelling and therefore that the upper term was warranted.

Defendants therefore cannot show that the failure to state reasons was prejudicial.

XX

SENATE BILL NO. 620

As mentioned, enhancements for the discharge of a firearm by a principal in a gang-related crime causing great bodily injury or death were found true. (Pen. Code, § 12022.53, subds. (d), (e)(1).) As a result, the trial court imposed additional consecutive terms of 25 years to life.

When defendants were sentenced, the trial court had no power to strike a firearm enhancement under Penal Code section 12022.53 . (See Pen. Code, former § 12022.53, subd. (h), Stats. 2010, ch. 711, § 5.) While this appeal was pending, however, Senate Bill 620 was enacted and became effective. (Stats. 2017, ch. 682.) As a result, a trial court now has discretion to strike such an enhancement. (Pen. Code, § 12022.53, subd. (h).)

Defendants argue that they are entitled to the benefit of this ameliorative change in the law. The People concede the point, and we agree. (*People v. Arredondo* (March 19,

86

2018, D072632) ___ Cal.App.5th ___, ___ [2018 Cal. App. LEXIS 217 at pp. *21-*24]; see also *id*. at pp. *29-*30 [conc. opn. of Benke, J.].)  Also, the People do not argue that it would be an abuse of discretion to strike the firearm enhancements.  Accordingly, we will remand with directions to consider whether to strike any of these firearm enhancements.  We express no opinion on how the trial court should exercise its discretion.

## XXI

## DISPOSITION

As to each of the three defendants, the gang special circumstance and the financial-gain special circumstance are reversed; in all other respects, the judgments with respect to the conviction are affirmed.  We express no opinion on whether these special circumstances may be retried.  (See *People v. Zermeno* (1999) 21 Cal.4th 927, 933, fn. 3; *People v. Swain* (1996) 12 Cal.4th 593, 610.)  However, if the People fail to bring any defendant to a new trial in a timely manner (see Pen. Code, § 1382, subd. (a)(2)), our remittitur shall be deemed to modify the judgment against that defendant by striking the gang special circumstance and the financial-gain special circumstance.

The judgments with respect to sentencing are reversed.  When the trial court resentences defendants, it shall exercise its discretion with respect to whether to strike any of the firearm enhancements under Penal Code section 12022.53.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ                    
                            P. J.


We concur:

MILLER                    
                  J.

FIELDS                  
                  J.